**PARKER LAND AND CATTLE COMPANY, Appellant (Petitioner),**

v.

**WYOMING GAME AND FISH COMMISSION, Appellee (Respondent).**

**No. 91–147.**

Supreme Court of Wyoming.

Jan. 22, 1993. ·

Rehearing Denied Feb. 24, 1993.

Stanley K. Hathaway, Brent R. Kunz and Rebecca Hellbaum of Hathaway, Speight, Kunz, Trautwein & Barrett, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., Mary B. Guthrie, Ron Arnold, Sr. Asst. Attys. Gen., Cheyenne, for appellee.

William Perry Pendley and Todd S. Welch of Mountain States Legal Foundation, Denver, amici curiae of Mountain States Legal Foundation and Wyoming Stock Growers Ass'n.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

* Chief Justice at time of oral argument.

GOLDEN, Justice.

This case presents a substantial evidence question and a narrow question of first impression: Whether the legislature in enacting Wyo.Stat. § 23–1–901 (July 1986)[1], which permits a landowner to present a claim to the State Game and Fish Department (Department) for property damages caused by game animals, waived the state's sovereign immunity from a landowner's claim for damages for the loss of cattle allegedly caused by the disease of brucellosis transmitted to the cattle by state-owned elk or bison.

Appellant Parker Land and Cattle Company (Parker) seeks review of an order of appellee Wyoming Game and Fish Commission (Commission) which denied Parker's damages claim under Wyo.Stat. § 23–1–901. After a contested case administrative hearing, the Commission held that a brucellosis contagion is not compensable under the statute in question and that Parker's claim was not supported by substantial evidence. Parker sought review of that agency decision from the district court. That court, invoking Wyo.R.App.P. 12.09, certified the matter here for appellate review.

For the reasons that follow, we hold that Wyo.Stat. § 23–1–901 is unambiguous and does not apply to Parker's claim for livestock damages allegedly caused by brucellosis contagion transmitted by state-owned elk or bison. Consequently, Parker's claim is not legally cognizable and, therefore, not compensable under the provisions of Wyo. Stat. § 23–1–901. In addition, we hold that substantial evidence exists to support the Commission's conclusion that Parker failed to prove with reasonable certainty that bison or elk were the source of brucellosis in its cattle herd.

We affirm the order of the Commission.

## FACTS

The State of Wyoming has for many years declared that "all wildlife in Wyoming is the property of the state." Wyo. Stat. § 23–1–103. The state's express policy is "to provide an adequate and flexible system for control, propagation, management, protection and regulation of all Wyoming wildlife." *Id.* To carry out this policy, the legislature has established a game and fish commission and a game and fish department which is under the direction and supervision of the Commission. *See generally,* Wyo.Stat. §§ 23–1–201, 301, 302, and 401 (1991).

Parker is the owner and operator of a cow-calf cattle ranch near Dubois, Fremont County, Wyoming. Parker claims its cattle commingle in its grazing area with elk throughout the grazing season from May to November each year. Parker also claims that its cattle may have come in contact with bison which were seen in the grazing area in 1988.

In 1988, some of Parker's cattle herd became infected with brucellosis, an infectious reproductive disease from bacteria of the genus brucella. It is transmitted orally by ingestion of the bacteria from contaminated placentas or other birth products of female animals. Its major manifestations are abortions or retained placentas in females and orchitis in males.

In early 1989, brucellosis infection in the Parker herd was confirmed. Upon orders of the United States Department of Agriculture and the Wyoming State Veterinarian, the Parker herd was quarantined and later depopulated.

Parker calculated its total damages at $1,136,106, the constituent elements being $149,560 for feed, transportation and other expenses caused by quarantine; $181,008 for loss of market value of cattle sold because of quarantine; and $805,538 for future loss of income because of capital loss of breeding herd.

Believing that the most probable source of the brucellosis infection was State of Wyoming wildlife, specifically, elk or bison, Parker timely filed its claim for damages with the Game and Fish Department under the provisions of Wyo.Stat. § 23–1–901. An administrative hearing, in the form of a contested case trial, was held before a hearing officer. Following the hearing, the

---

1. This statute is currently found in the June 1991 pamphlet and remains unchanged.

hearing officer issued findings of fact and conclusions of law recommending that the Commission deny Parker's damage claim on two grounds: 1) that brucellosis transmitted from wildlife is not a compensable injury under the provisions of Wyo.Stat. § 23–1–901, and 2) that Parker has not shown to a reasonable degree of probability which potential source was in fact the source of brucellosis in the Parker herd.

The Commission heard oral argument from the parties' counsel and then issued its order denying Parker's claim, adopting the hearing officer's findings of fact and conclusions of law. A copy of the Commission's order is attached as appendix I. Parker filed a petition for review of the Commission's decision with the district court. That court, under Wyo.R.App.P. 12.09, certified the petition to this court. Parker raises these issues:

1. Did Appellant prove by a preponderance of the evidence, be it direct and/or circumstantial, that its cattle were infected with the disease of brucellosis by big or trophy game animals and that Appellant was damaged thereby?

2. Is the damage suffered by Appellant, or any portion thereof, compensable under W.S. § 23–1–901, and has the Appellee waived the right of governmental immunity?

3. Were the Findings of Fact, Conclusions of Law, and Decision of the Game and Fish Commission arbitrary, capricious, an abuse of discretion or, otherwise, not in accordance with law?

## DISCUSSION

We will answer Parker's second issue first. This issue presents a question of statutory interpretation and, therefore, is a question of law. "Our standard of review for any conclusion of law is straightforward. If the conclusion of law is in accordance with law, it is affirmed, [*Dep't. of Rev. & Tax. v. Casper Legion Baseball Club, Inc.*, 767 P.2d 608 (Wyo.1989) ]; if it is not, it is to be corrected, [*Rocky Mountain Oil & Gas Ass'n v. State Bd. of Equalization*, 749 P.2d 221 (Wyo.1987) ]." *Employment Sec. Comm'n of Wyoming v.* *Western Gas Processors, Ltd.*, 786 P.2d 866, 871 (Wyo.1990).

I

At the outset of our exercise in statutory interpretation, we find it useful to warm up by reviewing this court's general method of statutory interpretation. Throughout this court's one hundred year history—from the first years of statehood generally identified with Justice Charles N. Potter (1895–1927) through the middle era strongly identified with Justice Fred H. Blume (1921–1962) and through the post-Blume period to the present (1962–1993)—the court has faithfully adhered to certain immutable principles which frame that method. As Justice Potter explained:

[T]he intent [of the lawgiver] is the vital part, and the essence of the law * * *. Such intent, however, is that which is embodied and expressed in the statute * * * under consideration.

*Rasmussen v. Baker*, 7 Wyo 117, 128, 50 P. 819, 821 (1897). *Accord, Allied–Signal, Inc. v. Wyoming State Bd. of Equalization*, 813 P.2d 214, 219 (Wyo.1991); *Morrison–Knudson Co. v. State Bd. of Equalization*, 58 Wyo. 500, 512, 135 P.2d 927, 931 (1943). "[T]he initial step in arriving at a correct interpretation * * * is an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection." *Rasmussen*, 7 Wyo. at 133, 50 P. at 823; *accord Radalj v. Union Savings & Loan Ass'n*, 59 Wyo. 140, 176–77, 138 P.2d 984, 996 (1943); and *Phillips v. Duro–Last Roofing, Inc.*, 806 P.2d 834, 837 (Wyo. 1991). A statute "must be construed as a whole in order to ascertain its intent and general purpose and also the meaning of each part." *Ross v. Trustees of University of Wyoming*, 31 Wyo. 464, 489, 228 P. 642, 651 (1924); *accord City of Laramie v. Facer*, 814 P.2d 268, 270 (Wyo.1991). "[W]e give effect to every word, clause and sentence and construe all components of a statute in pari materia." *Facer*, 814 P.2d at 270; *accord, State ex rel. Albany County Weed & Pest Dist. v. Bd. of County Comm'rs*, 592 P.2d 1154, 1157 (Wyo.1979).

Thus, our court has always understood and appreciated that statutory interpretation is a judicial process that emphasizes the functional relation between the parts and the whole. One of the more eloquent expressions of this truth was written by Judge Learned Hand:

> Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used * * *.

*Nat'l Relations Labor Bd. v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir.1941).

As we engage in this particular judicial process, we must heed this warning:

> It is always an unsafe way of construing a statute * * * to divide it, by a process of etymological dissection, into separate words, and then apply to each, thus separated from its context, some particular definition.

*Int'l Trust Co. v. Am. Loan & Trust Co.*, 62 Minn. 501, 65 N.W. 78, 79 (1895) (as quoted in Frank E. Horack, Jr., *The Disintegration of Statutory Construction*, 24 Ind.L.J. 335, 338 (1949)). As explained in that law review article,

> [n]one of us speak in single words; our symbolizing involves collective word use and we intend to convey meaning by the aggregate of our symbols interpreted in the surroundings of their use. Interpretation based upon individual words leads inevitably to the perversion of meaning.

Horack, *supra*, at 338.

As we read the text of a statute keeping in mind the functional relation between the parts and the whole, we know that statutory language may be either unambiguous or ambiguous. A "statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability." *Allied–Signal*, 813 P.2d at 220. "[A] statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations." *Id.* at 219–20. "[W]hether an ambiguity exists in a statute is a matter of law to be determined by the court." *Id.*

On numerous occasions the court has, over its long history, consistently followed a general rule that if the statutory language is unambiguous, the court may not resort to application of rules of construction. *See, e.g., Rasmussen*, 7 Wyo. at 128, 50 P. at 821 ("If the language employed is plain and unambiguous, there is no room left for construction. * * * Courts are not at liberty to depart from that meaning which is plainly declared."); *Gale v. Sch. Dist. No. 4*, 49 Wyo. 384, 54 P.2d 811 (1936); *Druley v. Houdesheldt*, 75 Wyo. 155, 294 P.2d 351 (1956); and *Zmijewski v. Wright*, 809 P.2d 280, 282 (Wyo.1991) ("If the language of a statute communicates a plain meaning to this court, that meaning will be applied.") [2]

On occasion, however, despite the court's having found a statute in question to be plain and unambiguous, the court has departed from the general rule and has resorted to extrinsic aids of interpretation to confirm the plain meaning. *See, e.g., Belle Fourche Pipeline Co. v. State*, 766 P.2d 537, 544–49 (Wyo.1988); *McArtor v. State*, 699 P.2d 288, 290 (Wyo.1985); *Albany County Weed & Pest*, 592 P.2d at 1157–58; *Town of Clearmont v. State Highway Comm'n*, 357 P.2d 470, 476 (Wyo.1960) (Blume, C.J.); *Gale*, 49 Wyo. at 393–94, 54 P.2d at 813–14; *Rasmussen*, 7 Wyo. at 136–48, 50 P. at 823–28; and *Cf., Sanches v. Sanches*, 626 P.2d 61, 62–63 (Wyo.1981) (resorting to the statute's legislative history to address an apparent ambiguity, the court discovered an inadvertent error in the transcribing of the enrolled act; upon correcting the statute, the court found the statute to be unambiguous).

---

**2.** Each of the justices participating in this decision has authored one or more majority opinions endorsing this rule:

*Keene v. State*, 812 P.2d 147, 150 (Wyo.1991) (Golden, J.)

*Allied–Signal v. Bd. of Equalization*, 813 P.2d 214, 219–20 (Wyo.1991) (Thomas, J.)

*NL Industries, Inc. v. Dill*, 769 P.2d 920, 926 (Wyo.1989) (Urbigkit, J.)

*Wyoming Mining Ass'n v. State*, 748 P.2d 718, 721 (Wyo.1988) (Cardine, J.)

*Wyoming Ins. Dep't v. Avemco Ins. Co.*, 726 P.2d 507, 510 (Wyo.1986) (Macy, J.)

With respect to legislative history as an extrinsic aid to statutory interpretation, this court has frequently remarked that such history "is nearly totally unavailable for understanding the actions of the Wyoming State Legislature." *Moncrief v. Harvey,* 816 P.2d 97, 111 (Wyo.1991) (Urbigkit, J., dissenting). *See also Pisano v. Shillinger,* 835 P.2d 1136, 1139 (Wyo.1992); *State v. Denhardt,* 760 P.2d 988, 990 (Wyo. 1988); and *State v. Stovall,* 648 P.2d 543, 546 (Wyo.1982) (Brown, J., "Because of the sparse legislative history kept in this state, peering into the past, even the very recent past, becomes as difficult as predicting the future.").[3]

When the court determines that a statute is ambiguous, the court "will resort to general principles of statutory construction in the effort to ascertain legislative intent." *Story v. State,* 755 P.2d 228, 231 (Wyo. 1988), *cert. denied,* —— U.S. ——, 111 S.Ct. 106, 112 L.Ed.2d 76 (1990). We believe that

> in ascertaining the legislative intent in enacting a statute * * * the court * * * must look to the mischief the act was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conditions of the law and all other prior and contemporaneous facts and circumstances that would enable the court intelligently to determine the intention of the lawmaking body.

*Carter v. Thompson Realty Co.,* 58 Wyo. 279, 291, 131 P.2d 297, 299 (1942); *see also, State ex rel. Motor Vehicle Div. v. Holtz,* 674 P.2d 732, 736 (Wyo.1983). "Knowledge of the settled principles of statutory interpretation must be imputed to the legislature." *In re Dragoni,* 53 Wyo. 143, 153, 79 P.2d 465, 467 (1938) (overruled on other grounds). This court presumes that the legislature enacts statutes "with full knowledge of the existing condition of the law and with reference to it. They are therefore to be construed in connection and in harmony with the existing law, and as part of a general and uniform system of jurisprudence * * *." *Civic Ass'n of Wyoming v. Railway Motor Fuels,* 57 Wyo. 213, 238, 116 P.2d 236, 245 (1941); *accord, L.U. Sheep Co. v. Bd. of County Comm'rs,* 790 P.2d 663 (Wyo.1990).

In the case of certain types of statutes relating to a particular subject matter, we have employed rules of construction tailored to the specific statute type. For example, "It is generally held that statutes authorizing suit against the state are to be strictly construed, since they are in derogation of the state's sovereignty." *Harrison v. Wyoming Liquor Comm'n,* 63 Wyo. 13, 24–25, 177 P.2d 397, 399 (1947); *accord Retail Clerks Local 187 v. Univ. of Wyoming,* 531 P.2d 884, 886 (Wyo.1975). Thus, we require in this particular area of the law that evidence of legislative intent be both unequivocal and textual. *Retail*

---

**3.** In *Drew v. Beckwith, Quinn & Co.,* 57 Wyo. 140, 114 P.2d 98, *reh. denied,* 57 Wyo. 140, 115 P.2d 651 (1941), Justice Fred H. Blume wrote the majority opinion in which he interpreted a statute he had sponsored some thirty years earlier while serving in the state senate in 1911. Following that opinion, appellate counsel, in a petition for rehearing, argued that it was improper for Justice Blume to interpret a statute he had sponsored some years earlier. In the court's denial of the petition for rehearing, Justice Blume responded:

> The writer hereof was unaware of any impropriety in writing the opinion, and unaware that he was less qualified to construe the legislative act above mentioned by reason of the fact that he sponsored it in the state senate. It is generally thought that thorough knowledge of the history of legislation—and sponsoring an act could only involve such knowledge—is an aid in the construction

thereof, rather than a disqualification. Of course, counsel is much too complimentary to the writer hereof in thinking that he, after the expiration of thirty years, would remember, either the intention of the legislature or his own, in connection with the phrase "organized under any law of this state," used in the legislative act of 1911. Reference to the writer's connection with that act was probably made by reason of the disappointment of counsel in the result of the case. And such disappointment is natural. Yet the members of the bar well know that the lot of lawyers is, unfortunately, in the nature of things, one of frequent disappointment. But in that connection they should remember that it gives no pleasure to the court to be the cause thereof. An opinion in cold type may seem to come from a bloodless heart, when in fact it found birth only after much travail.

*Drew,* 57 Wyo. at 170–71, 115 P.2d at 651–52.

*Clerks Local 187*, 531 P.2d at 886 ("We find no words of clear or direct consent to suit against the state contained in these statutes, and consent must be clearly shown").[4] Similarly, in the area of tax imposition we have required both unequivocal and textual evidence of legislative intent. *Wyoming Mining Ass'n v. State*, 748 P.2d 718, 721 (Wyo.1988); *Kelsey v. Taft*, 72 Wyo. 210, 219–20, 263 P.2d 135, 137–38 (1953). And, recently, we held that evidence of legislative intent to preclude judicial review of an administrative decision must be both unequivocal and textual. *Pisano*, 835 P.2d at 1138.

Another rule of statutory interpretation we have occasionally invoked is that, in construing an ambiguous statute, the administration of which is charged to a particular executive branch agency, we will give deference to that agency's interpretation unless it is clearly erroneous. *See, e.g., State ex rel. Wyoming Worker's Compensation Div. v. Mahoney*, 798 P.2d 836, 838 (Wyo.1990) ("some weight"); *Wyoming Mining*, 748 P.2d at 722 ("great deference"); *Stratman v. Admiral Beverage Corp.*, 760 P.2d 974, 986 (Wyo.1988) ("some deference").

Against this backdrop of "legisprudence (the jurisprudence of legislation),"[5] a useful outline of this court's method of statutory interpretation emerges. We read the text of the statute and pay attention to its internal structure and the functional relation between the parts and the whole. We make the determination as to meaning, that is, whether the statute's meaning is subject to varying interpretations. If we determine that the meaning is not subject to varying interpretations, that may end the exercise, although we may resort to extrinsic aids of interpretation, such as legislative history if available and rules of construction, to confirm the determination. On the other hand, if we determine that the meaning is subject to varying interpretations, we must resort to available extrinsic aids. If an ambiguous statute has been

construed by an agency charged with administering it, we will accord deference to, but are not bound by, that construction. After all, the final construction of an ambiguous statute is a question for the court.

## II

On at least three past occasions this court has considered appeals arising from proceedings in which Wyo.Stat. § 23–1–901 or one of its antecedents was involved. *See Matter of Wyoming Game and Fish Comm'n v. Smith*, 773 P.2d 941 (Wyo. 1989); *Cross v. State*, 370 P.2d 371, 93 A.L.R.2d 1357 (Wyo.1962); and *Van Horn v. Wyoming Game and Fish Comm'n*, 54 Wyo. 346, 92 P.2d 560 (1939). On none of those past occasions, however, was this court called upon to construe the meaning of the statute. This, then, is our first opportunity to do that. Wyo.Stat. § 23–1–901 reads:

**Owner of damaged property to report damage; claims for damages; time for filing; determination; appeal; arbitration.**

(a) Any landowner, lessee or agent whose property is being damaged by any of the big or trophy game animals or game birds of this state shall, not later than fifteen (15) days after the damage is discovered by the owner of the property or the representative of the owner, report the damage to the nearest game warden, damage control warden, supervisor or commission member.

(b) Any landowner, lessee or agent claiming damages from the state for injury or destruction of property by big or trophy game animals or game birds of this state shall present a verified claim for the damages to the Wyoming game and fish department not later than sixty (60) days after the damage or last item of damage is discovered. The claim shall specify the damage and amount claimed. As used in this subsection, "verified claim" means a claim which the claimant

---

**4.** *Accord, Ardestani v. I.N.S.*, 502 U.S. ——, ——, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171, 179 (1985).

**5.** William N. Eskridge, Jr., *The New Textualism*, 37 UCLA L.Rev. 621, 624 (1990).

has signed and sworn to be accurate before a person authorized to administer oaths.

(c) The department shall consider the claims based upon a description of the livestock damaged or killed by a trophy game animal, the damaged land, growing cultivated crops, stored crops, seed crops, improvements and extraordinary damage to grass. Claims shall be investigated by the department and rejected or allowed within ninety (90) days after submission, and paid in the amount determined to be due. In the event the department fails to act within ninety (90) days, the claim, including interest based on local bank preferred rates, shall be deemed to have been allowed. No award shall be allowed to any landowner who has not permitted hunting on his property during authorized hunting seasons. Any person failing to comply with any provision of this section is barred from making any claim against the department for damages. Any claimant aggrieved by the decision of the department may appeal to the commission within thirty (30) days after receipt of the decision of the department as provided by rules of practice and procedure promulgated by the commission. The commission shall review the department decision at its next meeting following receipt of notice of request for review. The commission shall review the investigative report of the department, and it may approve, modify or reverse the decision of the department.

(d) Within ninety (90) days after receiving notice of the decision of the commission, the claimant may in writing to the department call for arbitration. Within fifteen (15) days after the department receives the call for arbitration, the claimant and the department shall each appoint a disinterested arbitrator who is an elector residing in the county where the damage occurred and notify each other of the appointment. Within twenty (20) days after their appointment, the two (2) arbitrators shall appoint a third arbitrator possessing the same qualifications. If the third arbitrator is not appointed within the time prescribed, the

judge of the district court of the county or the court commissioner in the absence of the judge shall appoint the third arbitrator upon the application of either arbitrator.

(e) At least twenty (20) days before the hearing, the board of arbitrators shall provide the claimant and department notice of the time and place in the county when and where the parties will be heard and the claim investigated and decided by the board. A written copy of the decision shall be promptly served upon each party. Within ten (10) days after receipt of the decision, either party may apply to the board for modification of the decision under W.S. 1–36–111. Either party may apply to the district court for vacation of a decision under W.S. 1–36–114(a) or correction or modification of a decision under W.S. 1–36–115 within thirty (30) days after receipt of the decision or within twenty (20) days after action by the board on an application for modification under W.S. 1–36–111.

(f) If no applications under subsection (e) of this section are made after receipt of the decision, the commission shall promptly pay the amount, if any, including interest based on local bank preferred rates, awarded by the board. Within thirty (30) days after the award is final, the board's reasonable service and expense charges shall be paid by:

(i) The claimant if the award is no greater than the amount originally authorized by the commission;

(ii) Otherwise, the commission.

■ The terms "big game animals" and "trophy game animals" as used in subsections (a), (b), and (c) of the statute carry the definitions given them in Wyo.Stat. § 23–1–101. *See* Wyo.Stat. §§ 23–1–102(a)(xiii) and 23–1–101(a)(i) and (xii). Thus, the term "big game animals" means "antelope, bighorn sheep, deer, elk, moose or mountain goat." Wyo.Stat. § 23–1–101(a)(i). And, the term "trophy game animals" means "black bear, grizzly bear or mountain lion." Wyo.Stat. § 23–1–101(a)(xii). From our plain reading of these statutory provisions, we immediately see that bison is neither a

big game animal nor a trophy game animal. We conclude, therefore, that a livestock damage claim arising from property damage caused by a bison is not covered by the statutory language. Consequently, to the extent that Parker's claim rests on any evidence that its livestock damage was caused by bison, that claim is not legally cognizable under Wyo.Stat. § 23–1–901.

■ Since the terms "big game animals" and "trophy game animals" appear in the main subsections designated (a)–(c) of the statute, the parties agree that we must focus our attention on those particular subsections to resolve the precise question of statutory interpretation before us. That precise question is, quite simply, whether Parker's damage claim for livestock loss allegedly caused by brucellosis contagion transmitted to its livestock by state-owned elk falls within the confines of the statutory language.

Parker does not expressly claim that the statute is ambiguous. Although Parker concedes, as it must, that the statute does not expressly "refer to animal damage caused by a disease such as brucellosis," Parker contends that both subsections (a) and (b) "plainly authorize payment when property is damaged by big or trophy game animals * * *." Working from that perspective, Parker asserts that § 23–1–901 applies to the circumstances of this case by noting that livestock is "property" within the meaning of the statute and by alleging that its "property" was damaged by an elk, a "big game animal," through the contagion of brucellosis. Parker notes that § 23–1–901 does not expressly except disease-caused damage from the compensation scheme and reasons that injury or destruction of livestock by transmission of disease is no different from injury or destruction of livestock by combative predatory actions of game animals for which compensation has historically been awarded.

The Mountain States Legal Foundation and the Wyoming Stock Growers Association (*amici*) filed an *amicus* brief in support of Parker's position. *Amici* expressly assert the statute is unambiguous. They declare that had the Commission applied the first principle of statutory construction, namely, the plain meaning of the statutory language, the Commission's analysis would have been complete. In addition to embracing Parker's main argument, *amici* address the statute's failure to expressly mention disease-caused property damage. They note that the statute "does not enumerate any type of damage that it does cover." Unfortunately omitting any reference to the record, *amici* observes that for years the Commission has paid claims for "damage from the goring of livestock or the trampling of crops," and that neither "goring" nor "trampling" is a type of damage enumerated in the statute. Thus, they reason, if the Commission rests denial of Parker's disease-based claim on the statute's failure to specify disease as a type of damage that is compensable, then the Commission must also deny all claims for any type of damage, such as that caused by the commonly known tooth and claw predatory actions of game animals as well as the crop trampling actions of game animals, because the statute fails to specify the types of damage that are compensable. Since that construction renders the statute a nullity, and we must presume the legislature does not pass futile laws, they conclude that the Commission's contention must be rejected.

In passing, we note that the record contains Parker exhibit 24, which is a partial listing of some of the property damage claims presented to and acted upon by the Commission and Department for the period 1943 to 1990. The subject matter of the claims ranges from damage to or destruction of hay, pasture, seed, raspberry bushes, trees, a fence, a storm door, and a metal shed caused by elk, deer, antelope, moose, sage chicken and turkeys to horses injured by moose, sheep killed by mountain lion, a cow injured by a mountain sheep, a sheep gored by an elk, and cattle killed by an elk. The livestock were injured or killed by the physical combative predatory actions of the game animals involved. The products of the soil were victims of the foraging actions of the game animals or birds involved. The improvements were damaged by the game animals' physical

actions. In this regard, we note that the statute uses such language as "whose property is being damaged" [subsection (a)], "injury or destruction of property" [subsection (b)], and "shall consider the claims based upon a description of livestock damaged or killed * * *, the damaged land, growing cultivated crops, stored crops, seed crops, improvements and extraordinary damage to grass" [subsection (c)]. This language connotes property damage caused by an animal's natural physical activities of foraging, trampling, and fighting. In this regard, we also note that in title 23, entitled Game and Fish, there are companion statutes concerning authority to kill animals or birds "doing substantial damage to property" [Wyo.Stat. § 23-1-302(a)(viii)], to kill beaver if their usual activity "would be dangerous to livestock" [Wyo.Stat. § 23-3-114] and to kill "[a]ny bear, mountain lion, bobcat, weasel, badger, gray, red, and fox squirrels or muskrat doing damage to private property." [Wyo. Stat. § 23-3-115]. The language of these companion statutes also connotes property damage caused by an animal's natural physical activities.

Responding to the arguments advanced by Parker and *amici*, the Commission takes a simple, straightforward position.

We are reminded that the subsections of the statute must not be read in isolation. Rather, they must be read in pari materia and harmoniously to form a congruous whole. Unless the provisions are read in that manner, the Commission asserts, then the claims description requirement of subsection (c) is rendered meaningless. The Commission cautions that each subsection must be read in light of the other subsections and given a meaning so as not to render any subsection superfluous.

Viewing the statute as unambiguous, the Commission sees § 23-1-901(c) as "a limitation on damages which may be paid both as to the property damage and the kind of damage." In the Commission's view, subsection (c) unambiguously provides compensation for livestock loss only if a trophy game animal caused that loss. Because the text of the statute does not expressly mention disease or brucellosis, the landowner's claim predicated on disease-caused livestock loss is not compensable, according to the Commission. Further, the Commission asserts that a brucellosis-caused livestock loss is legally cognizable only under the provisions of Wyo.Stat. § 11-19-106 (1989), which relates specifically to diseased livestock.[6]

6. **Slaughter of diseased animals; owner's claims.**
(a) All claims against the state arising from the slaughter of animals, together with the order of the veterinarian, shall be submitted to the state auditor who shall examine them without unnecessary delay. For each claim he finds to be equitable and entitled to indemnity under this chapter the auditor shall issue his warrant on the state treasurer for the sum named in the claim. All claims for indemnity arising under the provisions of this chapter, before they are presented for payment to the auditor, shall be submitted to the state veterinarian who shall fully inform himself of the facts connected with each claim. The state veterinarian shall endorse on each claim his approval or rejection and shall express in such endorsement the reasons for his approval or rejection.
(b) If the state veterinarian rejects a claim it and the reasons for rejection shall be submitted to a board of arbitration consisting of three (3) members selected as follows:
(i) The state veterinarian shall select one (1) stock grower who is a resident of the county where the slaughtered animal for which the claim is made ranged;

(ii) The claimant shall select one (1) stock grower who is a resident of the same county; and
(iii) These two (2) shall choose the third member from among the stock growers of the same county.
(c) The indemnity granted shall be that amount fixed by the state board of equalization each year for assessment of livestock. It shall be paid to the owner upon his application and presentation of proofs prescribed herein within six (6) months of the date of slaughter for which payment is claimed. The claim shall be barred if not presented within the time limited.
(d) Payments shall be made by the state treasurer from funds appropriated as provided by W.S. 11-19-109. The right to indemnity is limited to animals destroyed by reason of existence or suspected existence of some epizootic form of infectious or contagious diseases, generally fatal or incurable.
(e) There is no right to indemnity and payment in the following cases:
(i) For animals belonging to the United States;

Having carefully read the statute and considered the competing arguments, we hold that the statute is unambiguous, that the Commission's construction is correct, and Parker's claim does not fall within the statute's provisions. In reading the statute, we combed its face for evidence of the intent with which the pertinent words were used and we weighed those words in the light of the structural context of the statute's three subsections which are the primary focus of attention. In subsection (a), the legislature has established, in obviously general language, a landowner's reporting requirement. Thus, within fifteen days of having discovered the property damage caused by big or trophy game animals or game birds, the landowner must report the damage to one of the designated officials. Contrary to Parker's assertion, this subsection contains no language "plainly authorizing payment" for property damage caused by both big and trophy game animals. The only purpose served by this subsection is the establishment of a prompt reporting requirement. Since the reporting requirement is common to those property damage occurrences encompassed by the statute, as are more specifically identified later in subsection (c), it was only natural that the statute's draftsman would use a word of broad meaning, "property," in subsection (a). The context of the reporting requirement is general; therefore, a general word is appropriate. The framing of a generalized reporting requirement was the draftsman's only goal in subsection (a).

Similarly, in subsection (b), the legislature has established, once again in obviously general language, a landowner's claim-filing requirement. Thus, within sixty days after the landowner's discovery of the property damage, the landowner must present a verified claim specifying the damage and amount claimed. Contrary to Parker's assertion, this subsection also contains no language "plainly authorizing payment" for property damage caused by both big *and* trophy game animals. The only purpose served by this subsection is the establishment of a claim-filing requirement. Like the reporting requirement of subsection (a), the claim-filing requirement of subsection (b) is common to those property damage occurrences encompassed by the statute, as are more specifically identified later in subsection (c). Just as it was only natural for the draftsman to use a word of broad meaning, "property," in subsection (a) to achieve his purpose, so too it was only natural for him to use the same word in subsection (b) to achieve his purpose. The context of the claim-filing requirement is general; therefore, a general word is appropriate. The framing of a generalized claim-filing requirement was the draftsman's only goal in subsection (b).

In subsection (c) of the statute, the legislature has established, in obviously precise language, the specific bases upon which the Department shall consider and pay the property damage claims filed pursuant to subsection (b). The purpose served by this subsection is the identification of the specific kinds of property damage caused by big or trophy game animals or game birds that the Department is authorized to compensate. It is only this third subsection that plainly authorizes payment of the claims filed. Because the draftsman's goal here is to identify with specificity the kinds of property damage that the state will pay for, he must use words of precise, not broad, meaning. The context is specific, not general. The draftsman must specify, not generalize. Had the legislature meant to achieve the broad coverage suggested

(ii) For animals that are brought into the state contrary to the laws of this state or the governor's import proclamation;

(iii) For animals found to be diseased upon arrival or that were exposed to the disease prior to their arrival in the state under circumstances whereby the Wyoming owner knew or should have known of such conditions;

(iv) When an animal was previously affected by any other disease which from its nature

and development was incurable and necessarily fatal;

(v) When the owner or person in charge has knowingly or negligently omitted to comply with W.S. 11–19–104 or 11–19–105; or

(vi) When the owner or claimant at the time of coming in possession of the animal knew it to be diseased or received the notice specified in W.S. 11–19–110.

Note that subsection (c) was amended in 1991.

by Parker, the draftsman would have generalized in subsection (c). He would have simply used general language to the effect that "[t]he department shall consider the claims based upon a description of the property damaged or destroyed by big or trophy game animals or game birds."

A generalization to this effect would have tracked consistently with the previous generalizations expressed in subsections (a) and (b). That the draftsman eschewed generalization in subsection (c) in favor of the specific language expressed there is significant for purposes of our determination of the statute's meaning. The legislature expressly links a livestock damage claim with only trophy game animal predatory activity by tooth and claw. In clear language, the legislature specifies that the Department shall consider a landowner's claim "based upon a description of the livestock damaged or killed by a trophy game animal * * *." Glaringly absent from this phrase is any mention of big game animals. Our ineluctable conclusion is that a landowner's claim based upon a description of the livestock damaged or killed by a big game animal, *viz.*, antelope, deer, elk, etc., does not lie under this statute. The words "damaged or killed" connote predatory, tooth and claw activity, not a disease process. The legislature has not in this particular statute waived the state's sovereign immunity from that type of property damage claim.

### III

Neither Parker nor *amici* resorts to the use of extrinsic aids to statutory construction, such as historical setting and legislative history, in an effort to demonstrate that the statute's plain meaning as the Commission reads it is unreasonable, produces an absurd result, or is obviously contrary to the legislature's intent. As we mentioned earlier, although this court has frequently said it will not resort to the use of extrinsic aids to statutory construction if it has first determined the statute is unam-

biguous and carries a plain meaning, this court has, occasionally, departed from that practice. In studying those cases in which this court has departed from its usual practice, we discern no single principle common to those cases which provides a useful indicator of what circumstances must exist for this court to make that departure. "[C]ommon sense suggests that inquiry benefits from reviewing additional information rather than ignoring it." *Wisconsin Public Intervenor v. Mortier*, 501 U.S. ——, —— n. 4, 111 S.Ct. 2476, 2485 n. 4, 115 L.Ed.2d 532, 547 n. 4 (1991). One scholar has said, "[t]he judge cannot ensure that his reading does not contradict some reasonable legislative reading of the words unless he canvasses the possibilities." [7]

Other minds, brighter than ours, have wrestled with this problem. Consider Justice Frankfurter's graceful statement:

> I should say that the troublesome phase of construction is the determination of the extent to which extraneous documentation and external circumstances may be allowed to infiltrate the text on the theory that they were part of it, written in ink discernible to the judicial eye.

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Col.L.Rev. 527, 529 (1947). Seeing statutes as "organisms which exist in their environment," *Id.* at 541, he believed "[i]f the purpose of construction is the ascertainment of meaning, nothing that is logically relevant should be excluded." *Id.* For the last half-century, the United States Supreme Court has routinely consulted legislative history even when its textual analyses have resulted in a plain-meaning determination. Patricia M. Wald, *The Sizzling Sleeper: The Use of Legislative History in Construing Statutes in the 1988–89 Term of the United States Supreme Court*, 39 Am.Univ.L.Rev. 277, 279–87, 298 (1990); Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L.Rev. 195 (1982–83); William N. Eskridge, Jr., *The New Textual-*

---

7. John M. Kernochan, *Statutory Interpretation: An Outline of Method*, 3 Dalhousie L.J. 333, 343 (1976).

*ism,* 37 UCLA L.Rev. 621, 626–41 (1990). Perhaps one of the better explanations of why judges should not foreclose consideration of extrinsic material is given by Judge Patricia M. Wald:

> One needs a sense of context in order to get meaning out of words, in statutes as in life * * *. Every day I am called upon to decide cases on the basis of what statutes mean and what they require of citizens or the government itself. When a statute comes before me to be interpreted, I want first and foremost to get the interpretation right. By that, I mean simply this: *I want to advance rather than impede or frustrate the will of Congress.*
>
> \* \* \* \* \* \*
>
> As we conscientiously embark on our duty to ascertain what the words mean in the context of the statute's aims and purposes, we are almost inevitably drawn to the historical record of what the men and women who proposed and sponsored the legislation intended to enact. We feel better when their words confirm our reading of the text; we worry more when it contradicts the text. This * * * does mean * * * that we think again when we face a contradiction between text and history, and we should. That, in a nutshell, explains why we still resort to legislative history even when we label the meaning of a statutory provision "plain" or "clear."
>
> \* \* \* \* \* \*
>
> [T]he job of statutory construction requires an open and creative mind—one that can draw upon a variety of different sources, text, statutory context, other relevant statutes, and legislative history to extrapolate the most appropriate *meaning* from what are basically only *words.*

Wald, *Sizzling Sleeper, supra,* at 301–02.

In 1979, this court approved of and used the method of statutory interpretation that Judge Wald is talking about:

> [W]e are convinced that whenever one party claims a right or seeks to impose an obligation under the terms of a statute, or group of statutes, it becomes necessary for us to read the statute, determine its intent and purpose, and give effect to that intention. This cannot be a mechanical process and therefore no statute is ever free from meaningful scrutiny by the court considering it.

*Albany County Weed & Pest,* 592 P.2d at 1157.

Refusing to treat statutory interpretation as a "mechanical process," although we had determined that the statute under consideration was unambiguous, we examined the statute's legislative history in order to meaningfully scrutinize the statute so as to determine its intent and purpose and give effect to that intention. Our examination of that legislative history confirmed our reading of the text. *Id.*

Since Parker claims a right or seeks to impose an obligation upon the state under the provisions of Wyo.Stat. § 23–1–901, we shall now employ that method of statutory interpretation which we used in *Albany County Weed & Pest.*[8] In our search for meaning, we do not forget that, although we are no longer confined *to* the text, we are still confined *by* it. *Frankfurter,* at 544. "In the end, language and external aids, each accorded the authority deserved in the circumstances, must be weighed in the balance of judicial judgment." *Id.*

### IV

In 1929, the Wyoming legislature passed the first law authorizing the filing of claims against the state for destruction of property by game animals or game birds. 1929 Wyo.Sess.Laws, ch. 85, § 1. A direct antecedent of Wyo.Stat. § 23–1–901, the law read:

> **Filing of claims for destruction of property by game animals and birds.** Any person, firm or corporation whose property is being damaged by any of the game animals or game birds of the state

---

**8.** More recently we used this method in *Belle Fourche Pipeline Co. v. State,* 766 P.2d 537, 544– 49 (1988).

of Wyoming shall, within 10 days time, report said damage to the nearest assistant game and fish commissioner or board member of the game and fish commission, stating that said animals or birds are destroying his or her property.

Provided, further, that any person, firm or corporation claiming damage from the state of Wyoming for the injury or destruction of property by game animals or game birds of this state shall present a verified claim therefor at the office of the state game and fish Commissioner not later than 6 months after said damage occurred, particularly specifying the damage and the amount claimed.

Any person, firm or corporation who shall fail to comply with this act shall be barred from making any claim against the state of Wyoming for damages caused by any of the game animals or game birds of this state.

Wyo.Stat. § 49–215 (1931).

In order to better understand the 1929 law's provisions and place the events leading up to and surrounding that law's enactment in proper historical perspective, we find it helpful to understand the early history of this high wind-swept land that was to become Wyoming Territory and later the State of Wyoming. Professor T.A. Larson teaches us that ancient man was in this land at least 11,000 years ago.[9] Most of those people left about 6,000 years ago because the land became a desert.[10] When the climate improved about 4,500 years ago, known as the Middle Period, the land was populated by a small group of foragers "with a marginal mixed economy of wild-vegetable products and rodent-size animals."[11] With further climatic improve-

ments, about 500 A.D., in the Late Period, "more people moved in and established a prosperous buffalo economy."[12] The Great Medicine Wheel, a stone circle seventy-five feet in diameter located in the Big Horn Mountains east of present day Lovell, is one of the Late Period's best known relics.[13]

Although no evidence exists that any Spanish expedition reached this land, a few Spanish articles dating to the 17th century have been discovered in Wyoming.[14] This land was visited by a few French traders in the 1790's, John Colter of the Lewis and Clark Expedition in 1807–08, and a handful of other white men from 1811–13.[15] These few were followed in the next two decades by fur traders, the famed mountain men, who lived off the land, explored, and trapped thousands of beaver.[16]

These early explorers found that the land was inhabited by nomadic Indian tribes and abundant wildlife.[17] "Wyoming was a good land for the nomadic hunting tribes. Game of all kind was plentiful and the plains abounded in buffalo on which their very existence depended * * *. To [the Indian] this land with its abundance of game and fish, its grass for his horses was ideal * * *. His way of life depended on his mobility to follow game."[18] Young Francis Parkman of Boston, who in 1846 spent time observing the way of life of then friendly Sioux on the Laramie plains, was impressed by the vast herds of antelope and buffalo, the latter providing immense amounts of meat and being the Indians' staple.[19]

The fur traders/mountain men who came to plunder the beaver constituted the first significant white penetration into this country. Wyoming waters teemed with count-

9. T.A. Larson, History of Wyoming, at 7 (1965).

10. Id.

11. Id.

12. Id.

13. Id. at 8.

14. Id.

15. Id.

16. Id.

17. James P. Blaisdell, A History of the Conservation Effort in Wyoming and the Wyoming Game and Fish Commission to 1950, pp. 1–8 (June 1964) (unpublished Master's thesis, University of Wyoming).

18. Id. at 4.

19. Id.

less beaver, the skins of which were destined to be worn as hats on the heads of countless numbers of people living thousands of miles distant from these plains rich in natural resources. Between 1815 and 1830 the beaver was ruthlessly hunted, its numbers decimated.[20] Temporarily, other game remained plentiful. "Mountain men and Indians wintering in the area wallowed in abundance."[21]

With the passing of the once prosperous beaver trade, the white man's commerce turned to buffalo robes.[22] Estimates were made that in 1830 about forty million buffalo roamed the Great Plains and mountains.[23] In the short span of forty years, those numbers would plummet to five and a half million.[24] In this same time period, the white man's introduction of cattle into this land began as a trickle. The mountain men brought the first cattle into the area.[25] Then in the 1840's and 1850's tens of thousands of cattle were driven into and out of the area along the Oregon–California–Utah trail.[26] At Ft. Laramie, in 1854, a fellow named Alexander Majors turned his small band of cattle out on the range rather than herd them back east and found they were able to survive the winter.[27] He claimed to have started in 1862 the first breeding herd in what would become Wyoming.[28] Mormons passing through to Utah and some who settled in southwestern Wyoming in the late 1850's may have had small breeding herds.[29] The small trickle grew to a steady stream in the 1860's. The local Cheyenne newspapers of that day reported increasing numbers of cattle grazing in the area in the late 1860's.[30] During the 1840's

to 1860's the white emigrants traveling through the land along the historic trails wrote about the superb game country. Elk, deer, antelope, mountain sheep, buffalo, and bear were everywhere. The lakes and streams were alive with fish.[31] The Indians frequently complained that the white visitors were driving game from the hunting grounds. With growing apprehension, they watched the inexorable trespass across and into the territory. At the time they had no way of knowing that to the east plans were being made for a transcontinental railroad and that a policy of manifest destiny would drive western settlement.[32] The disturbance of their hunting grounds was not the Indians' only grievance. As Professor Larson explains:

As the heavy migration along the Platte continued in the 1850's, a new grievance developed among the Indians. The Indian agent at Ft. Pierre reported in 1853 "the great loss of so many of their friends and relatives by the distressing ravages made by the introduction amongst them of the smallpox, measles, and cholera, which they attribute solely to the emigrants passing through their county."[33]

As the Civil War ended, white invasion into this magnificent natural game preserve intensified. The Union Pacific railroad construction was actively under way in 1867–69.[34] Thousands of men worked on the project.[35] The railroad brought towns to the area.[36] The senseless slaughter of the buffalo continued. "By 1871, the [buffalo] herds had been reduced to about five

20. *Id.*

21. *Id.* at 7.

22. *Id.* at 1–8.

23. *Id.*

24. *Id.* at 13.

25. Larson, *supra* note 9, at 163.

26. *Id.*

27. *Id.* at 164.

28. *Id.*

29. *Id.*

30. *Id.* at 164–65.

31. Blaisdell, *supra* note 17, at 9–11.

32. Larson, *supra* note 9, at 36 *et seq.*

33. *Id.* at 15–16.

34. *Id.* at 39.

35. *Id.*

36. *Id.* at 41–42.

and a half million." [37] And the slaughter continued. "Countless thousands of hides shipped eastward were the grim harvest of the plains. The carcasses, occasionally minus tongues and choice cuts taken by the hunters for themselves or for market, were left to rot." [38] Other game species were also heavily hunted for hides and heads, the antlers of elk and deer and the horns of antelope being much desired.

When the First Territorial Legislature convened in Cheyenne in October, 1869, it passed a 233-word "Act for the Protection for Game and Fish in the Territory of Wyoming." [39] An extremely ineffective law, this act contained no enforcement provisions concerning the taking of fish and game. It also contained no provision that the newly-formed territorial government would compensate property owners for damage to their property caused by wildlife.

The decade of the 1870's would be one in which white settlement increased and with it the expansion of the fledgling cattle industry. The Indian wars would be fought. Game animals in staggering numbers would be killed. "The assessment rolls of Wyoming Territory listed 8,143 cattle in 1870." [40] In the next eight years that number would swell enormously. In May, 1877, the surrender of Crazy Horse signaled that "the hostile bands were all cleared out of Wyoming and Montana." [41] In 1878, Governor Hoyt reported to the Secretary of the Interior "that the 250,000 to 300,000 cattle in the territory left much of the range unoccupied." [42] Newspapers in Cheyenne and Laramie frequently reported about hunters near town pursuing the game herds. [43] In the hard winters from 1879–81 large numbers of deer and antelope were shot by hunters. [44] Countless thousands more deer hides, antelope hides, and elk hides were shipped eastward. [45]

In the 1870's and 1880's, the territorial legislatures slowly and haltingly passed laws in feeble efforts to provide some semblance of protection for game and fish. [46] Despite this legislative activity, the law still contained no provision pursuant to which the territorial government would compensate property owners for property damage caused by wildlife.

Although in the late 1860's and early 1870's the white settlers' cattle grazed the range primarily in southeastern Wyoming, "[a]s soon as the Indian threat was eliminated, herds were pushed into the northeastern part of the territory." [47] Penetrated in 1879, the Big Horn Basin was "quite well stocked by 1884." [48] Professor Larson describes the numbers:

> In 1885, 894,788 cattle were assessed at $15,388,503; in 1886, 899,121 cattle were assessed at $14,654,125. * * * The evidence warrants an estimate of 1,500,000 cattle in Wyoming Territory in 1885 and 1886. In a few short years, 1878–1885, the Wyoming range had filled to overflowing. [49]

Another scholar tells us that in the five-year period from 1875–1880, the Wyoming cattle industry "had developed from a negligible factor in the territorial economy into a rival to the Union Pacific [Railroad] for

---

37. Blaisdell, *supra*, note 17, at 13.

38. *Id.* at 14.

39. Ch. 59, Compiled Laws of Wyoming 1869; Blaisdell, *supra* note 17, at 22.

40. Larson, *supra* note 9, at 165.

41. *Id.* at 106.

42. *Id.* at 166.

43. Blaisdell, *supra*, note 17, at 14–15, 18–21.

44. *Id.* at 18.

45. *Id.*

46. *See generally,* 1882 Wyo.Sess.Laws, 7th Legislative Session, ch. 49; 1884 Wyo.Sess.Laws, 8th Legislative Session, ch. 45; Wyo.Stat. §§ 1233–1237 title 14 (Fish) and title 16 §§ 1455–1459 (Game) (1887); Wyo.Sess.Laws 1886, ch. 109, § 1; and NEAL BLAIR, THE HISTORY OF WILDLIFE MANAGEMENT IN WYOMING, at 15–27 (1987).

47. Larson, *supra* note 9, at 166.

48. *Id.* at 167.

49. *Id.*

supremacy as a source of commercial livelihood." [50]

Because of the substantial capital investments and anticipated profits, the cattle interests were naturally concerned about protecting the health of their product. Having witnessed the great and largely uncontrolled influx of livestock into the territory and having become increasingly alarmed over the spread of contagious diseases such as Texas fever, foot and mouth disease, and pleuro-pneumonia, the influential stockmen of the 1880's successfully presented and won their case for protective legislation.[51] In 1882, the Seventh Territorial Legislature passed "An Act to Suppress and Prevent the Dissemination of Contagious or Infectious Disease Among Domestic Animals." 1882 Wyo.Sess.Laws, ch. 41, §§ 1-14. Under this law, the livestock interests enjoyed a number of protections. The legislature authorized the Governor to appoint a territorial veterinarian upon the recommendation of the territorial Stock Growers' Association and with the advice and consent of the legislature. The veterinarian had authority to investigate cases of contagious or infectious disease among domestic animals, to inspect domestic animals arriving in the territory, to order quarantines, and to order slaughters of diseased and exposed domestic animals. Another important facet of the law, for the purposes of this court's resolution of the instant appeal, authorized claims against the territory arising from the slaughter of domestic animals ordered by the territorial veterinarian. *Id.* § 10. "The indemnity to be granted shall be two-thirds of the ordinary value of the animal as determined by"

appraisers appointed for that purpose. *Id.* This indemnity right was

> limited to animals destroyed by reason of the existence or suspected existence of some epizootic disease, generally fatal and incurable such as rinderpest, hoof and mouth disease, pleuro pneumonia, anthrax or Texas fever among bovines, glanders among horses, and anthrax among sheep. For the ordinary contagious disease not in their nature fatal such as scab or hoofrot in sheep, and epizootic influenzas in horses no [indemnity] shall be paid.[52]

*Id.*

The territory's liability for animals destroyed under the law in any two years "is limited by and shall in no case exceed the amount especially appropriated for that purpose and for that period." [53] Finally, the law established the stock indemnity fund from which the indemnity payments were to be made.[54] The fund was funded by an annual tax assessment upon the assessed value of all cattle, sheep, horses, and mules in the territory.[55] Occasionally, revisions in the law were made. *See* 1886 Wyo.Sess.Laws, ch. 85, §§ 1, 2; Revised Statutes 1887, §§ 4208 and 4212; Revised Statutes 1889, § 159. But the substance of the law remained intact.

In September, 1889, when the members of the constitutional convention convened in Cheyenne, of the forty-nine delegates appearing at least fifteen had interests in ranching and livestock operations.[56] Of those fifteen stockmen, George W. Baxter, Henry G. Hay, and Hubert E. Teschemacher contributed substantially to the debates.[57] The conclusion is inescapable that the appearance of article 19, § 1 of the

50. LEWIS L. GOULD, WYOMING: FROM TERRITORY TO STATEHOOD, at 62–63 (1984); *see generally,* Larson *supra* note 9, at 163–94.

51. AGNES WRIGHT SPRING, SEVENTY YEARS: A PANORAMIC HISTORY OF THE WYOMING STOCK GROWER'S ASSOCIATION, at 20–28 (1942).

52. 1882 Wyo.Sess.Laws, ch. 41, § 10.

53. *Id.* § 12.

54. *Id.* § 13.

55. *Id.*

56. Larson, *supra* note 9, at 243, and MARIE H. ERWIN, WYOMING HISTORICAL BLUE BOOK, at 168, 638, 640, 643, 644, 645, 647, 922, 938, and 939 (1946). The fifteen were George W. Baxter, Henry G. Hay, William C. Irvine, Caleb P. Organ, Charles W. Holden, Alexander L. Sutherland, Jonathan Jones, Hubert E. Teschemacher, Charles L. Vagner, Robert C. Butler, Charles W. Burdick, DeForest Richards, Meyer Frank, George Ferris, and John McGill.

57. Larson, *supra*, note 9, at 244.

Wyoming Constitution, directing the legislature to enact legislation protecting livestock against various and sundry diseases,[58] is the product of the political and economic influence of the Wyoming stockmen.

Today, the provisions of Wyo.Stat. §§ 11–19–101 through 506, dealing with contagious and infectious diseases among livestock, continue the legislative purposes first begun with the territorial legislation of 1882 and implement the constitutional directive of Wyo. Const. art. 19, § 1. In particular, Wyo.Stat. § 11–19–106 describes a claim procedure that closely resembles the one first established by the territorial antecedent. The text describing the type of disease which gives rise to the indemnification right has been slightly amended by deletion of the reference to the specific diseases originally included in the 1882 law. Wyo.Stat. § 11–19–106(d). Also, the amount of the indemnity available upon approval of a claim has been changed from two-thirds of the destroyed animal's ordinary value; the law now provides that "[t]he indemnity granted shall be that amount fixed by the state board of equalization each year for assessment of livestock." Wyo.Stat. § 11–19–106(c). Claims payments are made from appropriated funds. Wyo.Stat. § 11–19–106(d).

From the year of statehood, 1890, the next several decades would witness an increasing interest shown in game protection and management.[59] But much remained to be done "to control the rapacious market hunters who were by no means curbed by the legislation itself which was hard to enforce under the best of circumstances and still lacked effective teeth."[60] With the buffalo on the verge of extinction, the third state legislature in 1895 passed a law making it a felony to kill a buffalo at any time of the year punishable by a prison term of three to ten years.[61] Progress in other areas was noted. The legislature authorized the fish commissioner to act as a state game warden.[62] A three-month season during which only males could be hunted was established for elk, deer, antelope, mountain sheep, and moose.[63] A five-year moratorium on beaver was imposed.[64] The purchase of hides and horns was prohibited.[65] Other problems persisted. "[F]unds were lacking to pay the game wardens."[66] Poaching was still prevalent.[67]

In 1899, the legislature created the office of State Game Warden.[68] Moose season was ordered closed until 1902, the beaver season for ten years.[69] The number of elk, deer, antelope and mountain sheep that could be taken in any one season was limited.[70] By the turn of the century, machinery was being gradually emplaced to make the game laws more effective.[71] "[P]rinciples of scientific game and fish management were slowly beginning to influence wildlife policy."[72]

Wildlife interests and domestic livestock interests shared a common need and a com-

---

58. **Legislature to provide for protection of livestock and stock owners.**—The legislature shall pass all necessary laws to provide for the protection of livestock against the introduction or spread of pleuro-pneumonia, glanders, splenetic or Texas fever, and other infectious or contagious diseases. The legislature shall also establish a system of quarantine, or inspection, and such other regulations as may be necessary for the protection of stock owners, and most conducive to the stock interests within the state.

59. Blaisdell, *supra* note 17, at 29–75.

60. *Id.* at 29–30.

61. *Id.* at 30.

62. *Id.* at 31.

63. *Id.*

64. *Id.*

65. *Id.*

66. *Id.* at 32.

67. *Id.* at 33.

68. *Id.*

69. *Id.* at 34.

70. *Id.*

71. *Id.* at 40.

72. *Id.*

mon problem. The need was sufficient forage, especially during the harsh winters; the problem, predators. In 1903, the state game warden, D.C. Nowlin, reported[73] to Governor Fenimore Chatterton that coyotes in increasing numbers, perhaps driven into the mountainous areas by the steady warfare waged against them on the sheep and cattle ranges, were killing young antelope, elk calves, and lambs of mountain sheep.[74] He noted that mountain lions preyed upon the elk, deer, and mountain sheep.[75] The competition for sufficient forage between domestic livestock and the large wildlife animals is demonstrated by the experience of the elk herd in northwestern Wyoming. In 1905, the legislature created the Teton State Game Preserve.[76] The elk herds thrived.[77] As one scholar explains:

> Controlled hunting and relatively mild winters had led to a great increase in the herds from 1904 to 1908. The state game preserve gave the elk a protected summer range and breeding ground. Yet the problem of potential winter losses was great.

> \* \* \* \* \* \*

> The great summer ranges of the elk were in and around Jackson Hole. Originally most of the elk migrated to winter ranges. \* \* \* The growth of ranching and the depredations of market hunters reduced the migrations considerably. Although a few hundred elk continued to make the trek as late as 1911, the development of the Green River area prevented large herds from using the route. The growth of hay and stock raising along with extensive fencing gradually curtailed the available ranges. With migration routes restricted the elk faced possible starvation. Large losses were reported in 1882, 1886 and 1889. The growth of settlement in Jackson Hole after 1884 made the situation of the great herds even more precarious. From 1909 to 1910, a severe winter caused the death of thousands of elk from starvation. That winter an estimated twenty to thirty thousand elk descended into Jackson Hole. The hard-pressed ranchers furnished hay and labor to feed the animals and the legislature appropriated five thousand dollars to purchase hay for the first large-scale winter game feeding program. Winter feeding would become common in the future, but it was evident that some provision for winter ranges must be made.[78]

To sustain the elk in the winter of 1911, Congress appropriated $20,000 for hay.[79] In 1913 Congress appropriated two and a half times that amount to buy lands on which to raise winter feeding hay.[80] That year, Congress established the National Elk Refuge.[81]

The state game warden's reports to the Governor from the early 1900's through 1931 revealingly document the problems which emanated from the necessary coexistence of domestic livestock and game animals on the finite ranges held under public and private ownership. For example, in his biennial report of 1913–14, he referred to "damage being done to ranchers by the elk which were shipped from Jackson to Glendo, Wyoming \* \* \* during the spring of 1912 \* \* \*."[82] In his annual report for 1915, he observed that once elk are fed and handled

---

73. We may take notice of official state reports: *Washakie Co. Sch. Dist. No. One v. Herschler,* 606 P.2d 310, 322 n. 16 and accompanying text (Wyo.1980), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28.

74. STATE OF WYOMING ANNUAL REPORT OF THE STATE GAME WARDEN TO THE GOVERNOR OF WYOMING 1903, at 5 (Wyoming State Library, Documents Division).

75. *Id.*

76. Blaisdell, *supra* note 17, at 38.

77. *Id.* at 43.

78. *Id.* at 43–44.

79. *Id.* at 45.

80. *Id.*

81. *Id.*

82. State of Wyoming, BIENNIAL REPORT OF THE STATE GAME WARDEN OF WYOMING 1913–14, at 14 (Wyoming State Library, Documents Division).

they become domesticated and we find it impossible to keep them from destroying the property of the ranchers * * * and in time they are sure to become a burden to the state * * *. At present several damage reports are being investigated. Much credit is due Mr. Robert Carey, of Careyhurst, Wyoming, who has given large quantities of hay * * * in protecting the Careyhurst herd, and * * * Mr. Carey has never asked the state for one cent of damage.[83]

In this same report, the state game warden makes this interesting reference to bear:

The much abused Bear is today one of our important game animals, and I cannot understand why, in the past, he has been considered predatory. It is true in times past, and even today, there are a few cases of Bear killing stock. In such districts he should not be protected, but if we give Mr. Bear the proper protection in districts where there is no danger of him becoming predatory, our state will derive great revenue from eastern sportsmen who have their eyes on Wyoming as a Bear Hunter's Paradise. I recommend that Bear be given fair consideration; not to such an extent, however, that they may become a menace to our livestock interests.[84]

In closing his report, he noted, "The Game Department is very much handicapped in its work through lack of wardens, the present wardens being compelled to patrol too much territory."[85] In 1915, the legislature passed a law authorizing game wardens to kill any elk found to be damaging personal property. 1915 Wyo. Sess.Laws, ch. 91, § 1; Wyo.Stat. § 3268 (1920). In 1916, the state game warden reported, "I agree that there are times when an old grizzly may kill stock * * *.

During the past year only two cases have been reported where any loss was substantiated by stockmen."[86]

In his biennial report for the years 1919–1920, the state game warden reported:

We do not favor the transplanting of elk in the State unless it is in a locality where they will not be a source of annoyance in damaging settlers' crops and bring expense to the State. It is quite different and there is not the justification for complaint from settlers who knowingly went into an elk country and settled, as they settled in those parts of the state with their eyes open and knowing the condition and what would happen in a severe winter. Yet many of them look ahead to these conditions and fence against these animals and protect their feed. In the localities where they have already been planted and they are damaging and will continue to annoy these settlers they should be in some manner removed * * *.[87]

The state game warden then gave an accounting of the twenty-five elk property damage claims totaling $16,748 that his department had received.[88] The types of damage reported included hay eaten and destroyed, crops destroyed and damage to fence.[89] In 1921, the legislature appropriated $10,000 "to liquidate claims for damages occasioned by the depredations of game animals of this state." 1921 Wyo. Sess.Laws, ch. 170, § 36. It also appropriated $30,000 "for use in connection with the Biological Survey of the Department of Agriculture of the United States Government, for the destruction of predatory wild animals." Id. § 17. Finally, of note, it appropriated $30,000 "to reimburse stockmen for livestock slaughtered by order of the State Veterinarian pursuant to law, for

**83.** State of Wyoming, Annual Report of the State Game Warden 1915, at 4 (Wyoming State Library, Documents Division).

**84.** *Id.* at 6.

**85.** *Id.* at 35.

**86.** State of Wyoming, Annual Report of the State Game Warden 1916, at 8 (Wyoming State Library, Documents Division).

**87.** State of Wyoming, Biennial Report of the State Game Warden of the State of Wyoming 1919–1920, at 7 (Wyoming State Library, Documents Division).

**88.** *Id.* at 8–9.

**89.** *Id.*

the years 1919, 1920, 1921 and 1922." *Id.* § 19. Since the legislature would not, until 1929, pass a game law providing for the game and fish department's entertaining, investigating, and paying property damage claims arising from game animal depredations, the legislature annually had to pass special appropriations to partially compensate ranchers for the hay, crops, and fence damages caused by the roaming game animals. In contrast, the legislature's claim law covering diseased livestock dated back to territorial days, as we explained earlier.

In 1921, the legislature created a game and fish commission, the members being the Governor, the Secretary of State, and the State Auditor.[90] The Governor appointed a game and fish commissioner to act as the chief executive officer.[91] That officer would regularly report to the Governor on the Commission's activities.[92] To that post, Governor Carey appointed Bruce Nowlin, whose father had served as state game warden from 1901–1910.[93]

In his biennial report for 1921–1922 to Governor Robert A. Carey, who as a private citizen in 1915 had not asked the state for one cent of damage for the large quantities of hay he gave to protect the Careyhurst elk herd, the state game and fish commissioner noted his disapproval of the transplanting of elk in areas where the elk might destroy the ranchers' feed.[94] He also noted that he had paid out nearly all of the $10,000 appropriation in "payment of damage claims for hay and feed destroyed by elk during the winter of 1919–20."[95]

In his biennial report of 1923–1924 to the Governor, the game and fish commissioner reported, among other things, that "[t]he funds at my disposal were far from adequate to give each phase of the work all that was required."[96] He remarked that lack of funds forced him to discontinue the services of fourteen deputies.[97] He informed the Governor that the elk herds had made it through the winters of the last few years due to the purchase of hay at a cost of $12,695.23 in 1923 and $6,956.81 in 1924.[98] After reporting on the status of elk, moose, antelope, deer, and mountain sheep, he reported on the status of bear which numbered from 1,000–1,500.[99] In particular, he said, "[t]he bear is a much maligned animal and while they will, if started that way, become stock killers, for the most part they do not know the taste of flesh. They exist on berries, roots, fish, fieldmice and gophers."[100] Asserting that "[c]onstant warfare is necessary"[101] to combat predatory animals, he reported that "[c]oyotes constitute the bulk of the predatory animals. These increase rapidly and are a constant menace to domestic stock, fowl, game birds and game animals."[102] Through the combined efforts of his agency, the federal government, and livestock interests, this warfare was being successfully waged.[103]

In 1925, the legislature passed an appropriations bill to compensate twenty-three individuals and one company, in amounts ranging from twenty dollars to five hundred dollars, for damage each sustained from game animal depredations.[104] In

90. Blair, *supra* note 46, at 57.

91. *Id.*

92. *Id.*

93. *Id.*

94. State of Wyoming, Biennial Report of the State Game and Fish Commissioner of the State of Wyoming 1921–1922, at 8 (Wyoming State Library, Documents Division).

95. *Id.* at 29.

96. State of Wyoming, Biennial Report of the State Game and Fish Commissioner of the State of Wyoming 1923–1924, at 9 (Wyoming State Library, Documents Division).

97. *Id.*

98. *Id.* at 10.

99. *Id.* at 11.

100. *Id.*

101. *Id.* at 14.

102. *Id.*

103. *Id.*

104. 1925 Wyo.Sess.Laws, ch. 90, § 1.

1927, the legislature authorized the state game and fish commissioner to kill any game animal found damaging personal property.[105]

In his biennial report for 1927–1928, the commissioner sounded the familiar themes of shortage of funds [106] and property damage caused by game animals. Relating to this latter subject, he encouraged consideration of the purchase of two ranches in Teton County to feed the elk herds which would "eliminate damage caused by elk to the ranchers in Teton County." [107] His preference for the establishment of permanent feeding grounds was driven by the desire to prevent the elk from straying "onto other ranches and [causing] considerable damage to hay, fences and pastures." [108] He also noted that "winter ranges now used by elk are becoming scarce and are grazed very short in the fall by stock." [109] Deer and antelope did not escape his scrutiny. "Ranchers in some counties in the state are bothered each year by deer and antelope." [110] He added that, "I am not in favor of planting game of any kind in sections of the state where they are liable to cause damage to ranchers." [111]

The state game and fish commissioner's biennial report for 1927–1928, the ending date of which was December 31, 1928, on the eve of the upcoming 1929 legislative session, is important in another pertinent respect. For the first time since the requirement of submission of reports was established in 1900, the Commissioner referred to the work of Mr. O.J. Murie, Associate Biologist, Biological Survey, Department of Agriculture, United States.[112] Mu-

rie had been studying diseases among the Teton County game animals.[113] The Commissioner included in his biennial report for 1927–28 a copy of Murie's report relating to his disease study. Prominently mentioned in Murie's report was the disease of necrotic stomatitis, or calf diphtheria, which "appears to have been the chief cause of losses on the feed grounds." [114] Obviously absent from Murie's report is any reference to brucellosis and any reference to concern about the transmission of diseases from game animals to domestic livestock. It is not surprising that Murie's report did not refer to these matters. We learn from the biennial report for 1929–1930, submitted for the period ending December 3, 1930,[115] what Murie knew. In Murie's report that was included in the 1929–1930 biennial report, he tells us, "[i]t has been generally believed that wild animals are rather free from disease. Investigations are now revealing a surprising variety of ailments not only among the elk, but also other species." [116] He added that, "[t]here are indications of other diseases [other than necrotic stomatitis] among the elk and with the cooperation of the Bureau of Animal Industry these are now being determined. It is hoped that in the near future definite conclusions may be reported." [117] Murie also mentions that the study of parasites, internal and external, was in the earliest stages and must await the availability of facilities.[118] Observing that the state game and fish commission was cooperating and giving encouragement, Murie indicates that at the National Elk Refuge he would carry on "experiments

**105.** 1927 Wyo.Sess.Laws, ch. 107, § 21.

**106.** State of Wyoming, Biennial Report of the State Game and Fish Commissioner of the State of Wyoming 1927–1928, at 11–12 (Wyoming State Library, Documents Division).

**107.** *Id.* at 13.

**108.** *Id.*

**109.** *Id.* at 14.

**110.** *Id.* at 15.

**111.** *Id.* at 17.

**112.** *Id.* at 17–21.

**113.** *Id.*

**114.** *Id.* at 19.

**115.** State of Wyoming, Biennial Report of the State Game and Fish Commissioner of the State of Wyoming 1929–1930 (Wyoming State Library, Documents Division).

**116.** *Id.* at 23.

**117.** *Id.*

**118.** *Id.*

* * * to gain a better understanding of the disease and parasite questions." [119]

From the literature submitted as exhibits by Parker and the Commission,[120] which literature relates to the earliest investigations and studies from 1917 and 1930 through the later studies in the 1970's dealing with game animal diseases, including brucellosis, we learn that the state and fund of knowledge of this subject matter, although rudimentary in those early years of the 1920's and 1930's, improved and increased in later years. Although in 1917 it had been reported that brucellosis had been detected in a bison in Yellowstone National Park, it was not until 1930 that Murie detected brucellosis in three elk from the National Elk Refuge. Not until 1934, was the Cooperative State–Federal Brucellosis Eradication Program initiated. Not until 1939 did the Wyoming State Legislature include brucellosis as one of the livestock diseases for which the state would compensate livestock owners whose diseased livestock was slaughtered as required by law. 1939 Wyo.Sess.Laws, ch. 27, § 1; Wyo.Stat. § 46–515 (1945). Today, this provision exists in Wyo.Stat. § 11–19–214 (1989). We have learned too, that although "[a] relationship between brucellosis in cattle and wild animals, primarily ungulates, has often been suspected * * * [f]ew studies have attempted to correlate brucellosis in wild species and domestic livestock." [121] McCorquodale and DiGiacomo reported in 1985 that "[w]hile there is indirect evidence that domestic livestock may spread the infection to wild species (Thimm, 1982), there are no reports that wild species are a source of infection for domestic animals under natural conditions." [122] Seemingly ahead of the wave in this area of scientific study is Dr. E.T. Thorne, wildlife veterinarian for the State Game and Fish Department and supervisor of the Wildlife Veterinary Service and Research Branch.[123] According to Dr. Thorne, "[b]rucellosis in elk undoubtedly originated from infected cattle. Perhaps bison played an intermediate role in transmitting the disease to elk." [124] Dr. Thorne and others began research in 1971 to determine the effects of brucellosis in elk.[125] In 1974, they also initiated studies "to determine the means and important times of *Brucella* transmission from elk to domestic cattle." [126] As a result of their studies, Dr. Thorne and his colleagues determined "that brucellosis will spread from elk to cattle under conditions of close association." [127] However, "[t]ransmission of brucellosis from free-ranging bison or elk to cattle has not been confirmed under field conditions." [128] From Parker's cross-examination of Dr. Thorne,[129] we have learned that until Parker's claim no disease-based damage claim had ever been presented to the game and fish department—a conclusion one might intuitively reach from an understanding of the history of the events before and after the passage of the 1929 game animal damage law.

119. *Id.* at 23–24.

120. Parker's exhibits 16 and 49; Game and Fish exhibits 2, 5, 6, and 7.

121. Game and Fish exhibit 2: Scott M. McCorquodale and Ronald F. DiGiacomo, *The Role of Wild North American Ungulates in the Epidemiology of Bovine Brucellosis: A Review,* 21 Journal of Wildlife Disease, at 351 (1985).

122. *Id.* at 355.

123. Thorne testimony, vol. III, p. 66.

124. Game and Fish exhibit 5: Tom Thorne, *Fighting Brucellosis in Wyoming Elk—A Shot in the Arm,* XLX Wyoming Wildlife, at 15 (September, 1985).

125. *Id.* Game and Fish exhibits 6 and 7, Parker's exhibits 16, 49, and 51.

126. State of Wyoming, Wyoming State Game and Fish Department, Project No. FW–3–R–22, Brucellosis Transmission Between Elk and Domestic Cattle, at 1923 (June 30, 1976) (Wyoming State Library, Documents Division).

127. Parker's exhibit 49: E.T. Thorne, Jamie K. Morton, and Winthrop C. Ray, *Brucellosis, Its Effect and Impact on Elk in Western Wyoming, in* North American Elk: Ecology, Behavior and Management, at 216 (1979, M.S. Boyce and L.D. Hayden–Wing, eds.).

128. Parker's exhibit 16, Brucellosis Control Strategic Plan (Draft 1990) at 2.

129. Thorne's testimony, *supra* note 123, at 69.

From the foregoing information we can reasonably conclude with a high degree of confidence that when the legislature met in its 1929 session, none of its members had a clue about the embryonic esoteric research studies of game animal diseases. None had the foggiest notion that perhaps some game animals could transmit diseases to domestic livestock.

Meeting in 1929, the legislature did possess, however, ample knowledge about the problem of game animal depredation of ranchers' hay, crops, and fences. Acting on this knowledge, the legislature passed the first law authorizing the filing of claims against the state for destruction of property by game animals or game birds. 1929 Wyo.Sess.Laws, ch. 85, § 1; Wyo. Stat. § 49–215 (1931). Quite obviously, the mischief to be remedied was the rancher's loss of hay, crops, and fencing caused by foraging elk, deer, and antelope, damages for which the legislature had been making special appropriations in the past. Quite obviously, the mischief not to be remedied, since it was unknown and remained unknown until only recently, was the rancher's livestock loss allegedly caused by the transmission of disease from game animals to livestock. In the same statutory article in which this 1929 law now appeared, the legislature defined the term "game animals" for the purpose of the article, which included the new game animal damage law, as meaning "any elk, deer, mountain sheep, wild goats, antelope or moose." Wyo.Stat. § 49–102 (1931). Noticeably missing from the legislature's definition were bear and mountain lion. The plain language of the law, therefore, did not purport to cover property damage by bear and mountain lion. Since bear and mountain lion, known killers by tooth and claw of livestock, were omitted from the coverage of the new game animal damage law, one may reasonably conclude that the 1929 legislature intended to compensate ranchers for only damage to products of the soil and improvements such as fencing and hay cribs caused by foraging elk, deer, and antelope.

We remarked earlier that in 1921, the legislature had authorized the game wardens' killing of any game animal found to be damaging personal property. 1921 Wyo. Sess. Laws, ch. 83, § 63. Obviously, the game animal killing law and the game animal damage law, both relating to the same subject matter, must be read in *pari materia*. Concerning the game animal killing law, we note in passing that in 1939, the legislature authorized the owner of private property, in those areas in which bear were classified as a game animal by the Commission, to immediately kill any bear doing damage to private property; in all other areas bear were classified as a predatory animal. 1939 Wyo.Sess.Laws, ch. 65, § 71; Wyo.Stat. § 47–502 (1945). We also note that in 1973, the legislature placed mountain lion and muskrat on the same list as bear as animals that a private property owner could immediately kill if they were doing damage to his property. 1973 Wyo. Sess.Laws, ch. 249, § 1, subch. 3, subart. 1; Wyo.Stat. § 23.1–68(a) (Supp.1975). In 1979, the legislature added bobcat, weasel, and gray, red, and fox squirrels to the list. 1979 Wyo.Sess.Laws, ch. 140, § 1; Wyo. Stat. § 23–3–115 (Supp.1979). Badger joined that select company in 1991. 1991 Wyo.Sess.Laws, ch. 103, § 1; Wyo.Stat. § 23–3–115(a) (1991).

Although the legislature would, over the next forty-one years, make minor changes in the 1929 game animal damage law, the key provisions would remain constant. *See* 1973 Wyo.Sess.Laws, ch. 249, § 1, art. 9; Wyo.Stat. § 23–117 (1957); 1955 Wyo.Sess. Laws, ch. 44, § 1; 1945 Wyo.Sess.Laws, ch. 155, § 1; Wyo.Stat. § 47–301 (1945); 1943 Wyo.Sess.Laws, ch. 112, § 8; 1939 Wyo. Sess.Laws, ch. 65, § 45.

Before we address the more recent legislative history of the 1929 game animal damage law for the light it sheds on our inquiry, in passing we should comment briefly about one other law passed in 1929. Joining the preexisting livestock disease legislation, of which we spoke earlier, was a law relating to cattle affected with tuberculosis. 1929 Wyo.Sess.Laws, ch. 44, § 1. Placed all by itself in article 9 of Wyoming Revised Statutes 1931 and designated § 67–901, this law provided that all cattle affected, without regard to source of trans-

mission, could be sent, under the state veterinarian's direction and federal regulations, to livestock markets in which they would be sold for salvage and destroyed. The cattle owner would receive the net sale proceeds; but if that sum was not equal to the assessed valuation of the cattle, then the livestock indemnity fund, which was established and maintained with respect to the other livestock disease law, would pay the shortfall. *Id.* In 1939, the legislature extended the coverage of the tuberculosis disease law to include Bang's disease. 1939 Wyo.Sess.Laws, ch. 27, § 1; Wyo. Stat. § 46–515 (1945). Named for the Danish veterinarian, Bernhard L.F. Bang, who in 1897 isolated the causative organism, Bang's disease is known as brucellosis.[130] Today, the tuberculosis/brucellosis provision appears, unchanged, in Wyo.Stat. § 11–19–214.

In 1929, the legislature loaned the game and fish department $100,000, a portion of which was used to pay some of the game animal damage claims.[131] In his biennial report for 1929–1930, the Commissioner worried about insufficient range conditions and the prospect of game animal damage to ranchers.[132] He commented that in 1929 men had to herd the elk around Sheridan County to prevent damage to ranchers.[133] He reported that "[a]t present in some counties in the state ranchers are complaining about antelope causing damage and we have several damage claims on hand at present * * *."[134] Damage claims for the period January 1, 1929, to December 31, 1930, totaled $12,120.50.[135] In the period 1933–1934, the deer population increased noticeably and "stockmen were complaining of damage by large herds."[136] The Commissioner would say of this time period

that "the settlement of damage claims causes the department more grief than all other duties assigned to it by the statutes."[137] Reportedly, "[e]lk and antelope were the principal offenders but there were complaints of damage by deer, bear, sage grouse and pheasants, varying from pheasants breaking windshields to elk eating strawberry sets, potatoes and stealing harness."[138]

Over the following decades, the game animal damage problem continued. For example, in the early 1940's in the Star Valley and Dubois areas, elk that had raided haystacks had to be removed.[139] The problem was exacerbated during the blizzard winter of 1949. Large herds of deer forced from their usual winter habitat and into the lower country concentrated on ranch property.[140] "[D]epradations on haystacks became so serious that steps [were] taken to prevent excessive loss among the deer, as well as to forestall considerable damage to livestock feed."[141] The Commission paid $31,853.32 in damage claims that calendar year.[142] A knowledgeable source has written:

> All damage giving rise to these claims was committed by big game animals, except that in two instances damage in the amount of $200 was done by sage grouse. Additional claims * * * amounted to $12,000.

> Over and above damage claims paid in cash considerable depredation on haystacks and livestock feed lots by game animals occurred during the winter storms of 1949. In many cases, wild animals had clearly raided or destroyed supplies of hay required to feed a rancher's livestock through the winter, and the Commission made immediate restitution

**130.** Rue Jensen and Donald R. Mackey, Diseases of Feedlot Cattle, at 95–101 (1971).

**131.** Blair, *supra* note 46, at 71.

**132.** Biennial Report, *supra* note 115, at 12–15.

**133.** *Id.* at 13.

**134.** *Id.* at 15.

**135.** *Id.* at 28.

**136.** Blair, *supra* note 46, at 73.

**137.** *Id.*

**138.** *Id.*

**139.** *Id.* at 108.

**140.** *Id.* at 127.

**141.** *Id.* at 128.

**142.** *Id.* at 130.

from its own hay supplies, ton for ton, thereby forestalling actual damage claims.[143]

In 1952, Dr. Ira N. Gabrielson, of the Wildlife Management Institute, Washington, D.C., submitted a report to the Commission after spending several months analyzing the Game and Fish Department's operations. In his report he recommended, among other changes, that the game animal damage law be revised so that only limited claims could be paid.[144] In Dr. Gabrielson's opinion, in his previous studies of the game laws of many other states, only in Wyoming had he found laws which gave "so much special consideration to livestock operators at the expense of the fish and game resources * * *."[145] The legislature never acted on Dr. Gabrielson's recommendations.

In 1971, the legislature made the first significant changes in the game animal damage law since the law was first enacted in 1929. Other significant legislative changes worthy of comment were made again in 1973 and in 1980. We now focus our attention on this more recent legislative history for the evidence it may provide in our determination of the meaning of the law we have before us.

As the 1971 legislative session convened, the game animal damage law remained substantively unchanged since first enacted in 1929: Any person whose property had been damaged by game animals or game birds must report that damage promptly and could present a claim specifying the damage and the amount claimed. In the 1971 session, the legislature made the following changes to this law. First, it separated the statute into four subsections designated as (a)–(d). 1971 Wyo.Sess.Laws, ch. 60, § 1. It placed the damage reporting requirement in subsection (a) and the claim presentation requirement in subsection (b). *Id.* The first sentence of subsection (b) contained language saying that any person claiming damages for injury or destruction

of property by game animals or game birds shall present a claim specifying the damage and the amount claimed. A sentence was added to that language: "The Commission shall consider such claims based upon a description of the damaged land, growing crops, stored crops, seed crops, improvements, and extraordinary damage to grass." *Id.* By inserting the latter sentence into the statute, the legislature, for the first time in the forty-two year history of the statute, had provided express guidance to the Commission and the property owner relative to the basis upon which the Commission was to consider the property owner's damage claim. Noticeably missing from this newly-identified basis was any reference to injured or killed livestock. Rather, the basis referred only to real property (damaged land), improvements, and produce of the land (growing crops, stored crops, seed crops and grass). Our review of the action taken by the House and Senate on this piece of legislation, designated H.B. No. 128, during the session of its enactment, reveals no other information pertinent to our inquiry. House Digest, 41st Legislature (1971), 603–05.

In 1973, the legislature continued to work on the game and fish laws. Introduced as H.B. No. 16 and enacted into law as chapter 249, Laws 1973, this legislation constituted a complete recodification of the game and fish laws. Of the many changes made, only a few concern our inquiry. The legislature separated game animals into two classifications, one designated "big game animals" and the other "trophy game animals." 1973 Wyo.Sess.Laws, ch. 249, § 1; Wyo.Stat. § 23.1–1(b) and (c) (1957 & Supp.1975). The term "big game animal" meant "antelope, big horn sheep, deer, elk, moose, or mountain goat." The term "trophy game animal" meant "black bear, grizzly bear or mountain lion." *Id.* With respect to the game animal damage law, the legislature made several changes of note. First, it now identified the property

---

**143.** *Id.*

**144.** State of Wyoming, Report to the Wyoming Game and Fish Commission by Ira N. Gabrielson, at

31–33 (March 1952) (Wyoming State Library, Documents Division).

**145.** *Id.* at 31.

owner as "[a]ny landowner, lessee or agent." 1973 Wyo.Sess.Laws, ch. 249, art. 9; Wyo.Stat. § 23.1–32(a) and (b) (Supp. 1975). Next, it changed "game animals" to "big or trophy game animals." Then, it placed the provision specifying the basis upon which the Commission shall consider the claims into a separate subsection (c). Finally, in that separate subsection (c), it inserted the word "cultivated" between the words "growing crops." As changed, then, the law provided that any landowner whose property was injured or destroyed by big or trophy game animals could report the damage and present a claim specifying the damage and amount claimed; then, "[t]he Commission shall consider the claims based upon a description of the damaged land, growing cultivated crops, stored crops, seed crops, improvements, and extraordinary damage to grass." § 23.1–32(c). Our review of the action taken by the House and Senate on this piece of legislation reveals no other information pertinent to our inquiry. House Digest, 42nd State Legislature 513–32 (1973).

In 1980, in a budget session, the legislature focused its attention once again on the big or trophy game animal damage statute. Sponsored by Senator Gerald F. Geis, S.F. No. 019, as introduced, proposed to amend subsections (b) and (c) of the statute "relating to damage to livestock caused by trophy game animals." Senate Files, 45th Legislature (1980). Specifically, the bill proposed to insert the following sentence into subsection (b) of the statute which contained the claim presentation requirement: "In the case of a trophy game animal, damage to livestock may be claimed and received if the owner of the livestock submits a statement under oath from a state or federal government trapper which verifies that the livestock was damaged or killed by a trophy game animal." *Id.* Also, the bill proposed to insert after the words "based upon a description of" in the first sentence of subsection (c) of the statute, which related to the basis upon which the Commission shall consider the claim, the phrase "the livestock alleged to have been damaged or killed by a trophy game animal." *Id.*

Before the bill cleared the Senate and was sent to the House, the senators had deleted the proposed change to subsection (b). Senate Digest, 45th State Legislature (1980), 33. However, the proposed change to the first sentence in subsection (c) remained intact. *Id.* In the House, the representatives slightly altered the language of the proposed change to the first sentence in subsection (c). Specifically, from the phrase "the livestock alleged to have been damaged or killed by a trophy game animal" they deleted the words "alleged to have been" and the words "by a trophy game animal." *Id.* With those deletions, the phrase read "the livestock damaged or killed."

Had those deletions passed muster with the Senate, which they did not as we shall see, the first sentence in subsection (c) of the statute would have read "the commission shall consider the claims based upon a description of *the livestock damaged or killed,* the damaged land, growing cultivated crops, stored crops, seed crops, improvements, and extraordinary damage to grass." (Emphasis supplied). Had the legislature enacted the bill in that form, then a compelling argument could be made that the legislature had consented to state liability for livestock damaged or killed by *both* big game or trophy game animals. However, the Senate, where the bill originated, did *not* adopt the House deletions. *Id.* In the joint conference committee appointed to resolve the disagreement, the members agreed to re-insert the words "by a trophy game animal" to the first sentence of subsection (c). *Id.* Both the Senate and the House adopted the joint conference committee's report. *Id.* As ultimately enacted, then, the law, as set forth in subsection (c) of the statute, read in pertinent part, "The commission shall consider the claims based upon a description of *the livestock damaged or killed by a trophy game animal,*" etc. (Emphasis supplied). 1980 Wyo.Sess.Laws, ch. 37, § 1; Wyo.Stat. § 23-1–901(c) (Supp.1980). This legislative action unmistakably reveals a clear intention to limit the claim coverage to livestock damaged or killed by a trophy game ani-

mal, *viz.*, black bear, grizzly bear, and mountain lion. Wyo.Stat. § 23–1–101(a)(xii) (Supp.1980). It also unmistakably reveals a clear intention not to broaden the claim coverage to livestock damaged or killed by big game animals, *viz.*, elk, deer, antelope, bighorn sheep, moose, and mountain goat. Wyo.Stat. § 23–1–101(a)(i).

In light of all of the above and foregoing discussion of the historical setting leading up to and surrounding the enactment of the 1929 game animals damage law and its present-day descendent, the mischief the law was intended to cure, the conditions of the law and all other prior and contemporaneous facts and circumstances that have enabled this court intelligently to determine the intention of the Wyoming legislature, a serious argument cannot be made that these external matters, including the law's legislative history, disclose that the statute's plain meaning, which we earlier derived by our simple reading of the text, is unreasonable, produces an absurd result, or is obviously contrary to the legislature's intent. We hold that the historical record does not contradict our plain reading of the text; to the contrary, it readily confirms it.

Holmes believed that "a page of history is worth a volume of logic." [146] The several pages of Wyoming history we have turned today have proved his point.

*Substantial Evidence*

■ Even were we to find that Parker's claim is cognizable under Wyo.Stat. § 23–1–901, we would have to affirm the Commission's decision that Parker failed to show to a reasonable degree of probability which potential source was in fact the source of brucellosis in the Parker herd. We hold that the Commission's decision in this regard is based on substantial evidence in the record.

■ In conducting our review of administrative action in the context of the sufficiency of the evidence, we are charged by statute to examine the whole record to determine if there is substantial evidence to support the agency's findings. Wyo.

Stat. § 16–3–114(c). If the agency's decision is found to be supported by substantial evidence, we cannot substitute our judgment for that of the agency; rather we are required to uphold its findings upon appeal. *Mountain Fuel Supply Co. v. Wyoming Public Service Comm'n*, 662 P.2d 878, 882 (Wyo.1983). In administrative appeals, we apply a definition of substantial evidence "as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mountain Fuel*, at 882 (quoting *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)). *See also, Bd. of Trustees, Laramie County Sch. Dist. No. 1 v. Spiegel*, 549 P.2d 1161, 1178 (Wyo. 1976). We have also said that substantial evidence

> may be less than the weight of the evidence, but cannot be clearly contrary to the overwhelming weight of the evidence. It is more than a mere scintilla of evidence or suspicion of a fact to be established. * * * If there is present substantial evidence to support a finding of the agency, the ultimate weight to be given that evidence before the [agency], as the trier of fact, is to be determined by the [agency] in light of its expertise and the experience of its members in such matters.

*Mountain Fuel*, 662 P.2d at 882–83 (citations omitted).

With this standard of review in mind, we turn to the Commission's finding that Parker failed to prove its claim that Wyoming elk or bison transmitted brucellosis to the Parker herd.

Parker's argument, concerning the Commission's findings of fact, is couched as a challenge to the weight given the evidence by the trier of fact. For example, Parker argues:

> These findings totally *ignore the cross-examination* of [the] [g]ame [w]arden. * * * Finding of Fact No. 35 is also *controverted* by the testimony referred to above. * * * When scientific evidence is carefully *weighed*. * * * In Finding of Fact No. 44 he [hearing officer] found

**146.** *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921).

that Drs. Bridgewater, Nicolletti and Thorne were the experts who were *best qualified and most credible* * * *. (emphasis added).

As stated above, the weight to be given the evidence is determined solely by the agency, as the trier of fact and expert in the field. Therefore, much of Parker's argument concerning the Commission's findings of fact is irrelevant.

Despite a mass of expert testimony contained in reams of transcript, it would be impossible for any reasonable person to discern with any certainty, from this record, which potential source of brucellosis most likely infected Parker's herd. A parade of experts failed to provide a clear opinion as to the most likely source. Three expert witnesses could conclusively state that wildlife was the most likely potential source. However, three different experts could not determine the most likely potential source for the brucellosis outbreak. In addition, each of the three experts who could not point to a probable source has relevant expertise with brucellosis. Dr. Bridgewater is the actual investigating veterinarian of the Parker outbreak, Dr. Thorne is the foremost expert on brucellosis in Wyoming elk, and Dr. Nicolletti is a world renowned expert in bovine brucellosis. From this testimony alone, there exists substantial evidence to support the Commission's finding that Parker failed to demonstrate the most likely source to a reasonable degree of certainty.

However, based upon evidence concerning the transmissibility of brucellosis from wildlife to livestock in the natural environment and evidence of elk and bison behavior, it was reasonable to conclude that Parker failed to meet the burden of proving wildlife as the likely source. It is uncontroverted that the primary mode of transmission of brucellosis from one animal to another requires the transmittee to ingest either infected placenta or some other infected birth product. Therefore, an individual cow must gain access to either an elk's or bison's infected aborted fetus or related fluids, or the afterbirth of an infected viable fetus.

Concerning elk in particular, Kay Bowles, who is the Game and Fish Warden in the Parker ranch vicinity, and Dr. Thorne testified consistently and without significant contest about elk reproduction behavior. In short, they explained that elk, to avoid predation, isolate themselves during the birthing process and then quickly consume the entire afterbirth and fastidiously clean the area where the birth or abortion had occurred. This behavior severely reduces the availability of infected material for cattle to ingest.

In addition, these same two witnesses testified to the unlikelihood of contact between Parker's cattle and an infected elk, at a time ripe for transmission. Game Warden Bowles made this conclusion based upon years of experience observing elk movements in the Parker ranch area. Dr. Thorne was able to reach this same result by examining several related factors. First, brucellosis is not self-sustaining in an elk herd which does not winter on feedgrounds (non-feedground herds). Thus, very few individual non-feedground elk actually carry brucellosis. Second, all feedground herds—those that sustain brucellosis—generally exist west of the continental divide, while the Parker grazing units are east of the continental divide. Third, most feedground female elk winter and, therefore, will abort on the west side of the divide and also calve in traditional areas on the west side, while the non-feedground female elk generally winter and calve at traditional areas east of the divide, closer to the Parker grazing units. Hence, the opportunity for Parker cattle to commingle with infected feedground female elk during calving or abortion season is minimal, and in turn, so is the opportunity for brucellosis transmission.

Based upon the testimony concerning brucellosis transmission, elk reproduction behavior, and elk herding/migration patterns, it is clear that the potential for transmission of brucellosis from elk to cattle in the wild is remote at best. Therefore, it was reasonable for the Commission to conclude that Parker failed to demonstrate

that elk were the most likely source of the Parker herd infection.

As to the bison, transmission of brucellosis from bison to cattle occurs primarily through the same basic process as described previously. Hence, an infected female bison had to have calved or aborted, leaving afterbirth available for consumption in an area accessible to Parker's herd.

After examining the evidence presented concerning bison, we feel it would have been unreasonable for the hearing officer to have concluded that Parker had proved, to a reasonable degree of certainty, that bison were the brucellosis source. Precious little evidence was presented on the bison issue. It was established that a total of nine head of bison—some male, some female, and some calves—were observed on or near the Parker grazing allotments in July of 1988. It was also demonstrated that approximately two-thirds of the estimated 120 Grand Teton bison were infected with brucellosis and that the Yellowstone bison population is, to some extent, also infected with brucellosis. In addition, Dr. Thorne testified that as between elk and bison, bison are more likely to have transmitted brucellosis because they do not isolate themselves to calve.

However, unlike the elk evidence, there was little testimony concerning bison migration patterns or testimony as to the bison's calving season or when they are likely to abort. The evidence demonstrated that a small number of bison, which may or may not be infected with brucellosis, were close to Parker's herd during the summer of 1988. This simply indicates that the opportunity for transmission was increased. Those factors, however, do not prove, with any certainty, that bison were the source of the Parker infection.

Having carefully examined the whole record, we hold that substantial evidence exists to support the Commission's findings.

For the above and foregoing reasons, we affirm the order of the Commission.

THOMAS, J., files an opinion concurring in part and dissenting in part.

CARDINE, J., files a specially concurring opinion.

URBIGKIT, J., files a dissenting opinion.

## APPENDIX I

### BEFORE THE WYOMING GAME AND FISH COMMISSION

In the Matter of: Parker Land and Cattle Company Damage Claim

Claim No. FY90–119

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER DENYING CLAIM

APPEARANCES: Stanley K. Hathaway and Brent R. Kunz, Cheyenne, Wyoming, for Claimant Parker Land and Cattle Company.

Roger C. Fransen, Senior Assistant Attorney General, Cheyenne, Wyoming, for the Wyoming Game and Fish Department.

HEARING: Testimony was taken before and exhibits received by John F. Raper, Hearing Officer, appointed by the Wyoming Game and Fish Commission, in Room 114, Herschler Building, Cheyenne, Wyoming, on November 13, 14 and 15, 1990.

### INTRODUCTION

The claim is being denied on two grounds:

1. Brucellosis transmitted from wildlife is not a compensable injury under the provisions of W.S. 23–1–901, quoted in pertinent part as follows:

(a) Any landowner, lessee or agent whose property is being damaged by any of the big or trophy game animals or game birds of this state shall, not later than fifteen (15) days after the damage is discovered by the owner of the property or the representative of the owner, report the damage to the nearest game warden, damage control warden, supervisor, or commission member.

(b) Any landowner, lessee or agent claiming damages from the state for injury or destruction of property by big or

trophy game animals or game birds of this state shall present a verified claim for the damages to the Wyoming game and fish department not later than sixty (60) days after the damage or last item of damage is discovered. The claim shall specify the damage and amount claimed.

(c) The department shall consider the claims based upon a description of the livestock damaged or killed by a trophy game animal, the damaged land, growing cultivated crops, stored crops, seed crops, improvements and extraordinary damage to grass. Claims shall be investigated by the department and rejected or allowed within ninety (90) days after submission, and paid in the amount determined to be due. In the event the department fails to act within ninety (90) days, the claim, including interest based on local bank preferred rates, shall be deemed to have been allowed. No award shall be allowed to any landowner who has not permitted hunting on his property during authorized hunting seasons. Any person failing to comply with any provision of this section is barred from making any claim against the department for damages. Any claimant aggrieved by the decision of the department may appeal to the commission within thirty (30) days after receipt of the decision of the department as provided by rules of practice and procedure promulgated by the commission. The commission shall review the department decision at its next meeting following receipt of notice of request for review. The commission shall review the investigative report of the department, and it may approve, modify or reverse the decision of the department.

2. Claimant has not shown to a reasonable degree of probability which potential source was in fact the source of brucellosis in the Parker herd.

## FINDINGS OF FACT

1. The Wyoming Game and Fish Commission has jurisdiction. W.S. 23–1–901.

2. The parties to this proceeding are the Wyoming Game and Fish Department (Department) and the Parker Land and Cattle Company, Inc. (Parker). Parker has filed its claim for damages with the Wyoming Game and Fish Commission (Commission) under W.S. 23–1–901. Mr. John Story appears here as a representative of Parker but is not a party to these proceedings in his individual capacity.

3. Parker, at the time of the brucellosis outbreak in the winter of 1988–1989, was engaged in a cow/calf operation on a combination of deeded lands which it owns and leased lands belonging to the United States and administered by the U.S. Forest Service and the Bureau of Land Management, all located in the Dubois, Wyoming area east of the Continental Divide. [V. II, p. 109; G & F Ex. 29]

4. Parker's cattle winter on deeded land near the home ranch. Around the first of May the cattle move onto spring range which consists of a combination of deeded and BLM lands. That portion of the ranch known as Crooked Creek is spring range. On about June 16, the cattle are moved onto Forest Service grazing allotments. The Warm Springs allotment extends west to the Continental Divide. On about October 10, the cattle are brought back to lower pastures. [V. II, 117–22]

5. Parker's cattle come into contact with elk on the spring pasture called Crooked Creek and on the Forest Service allotments. [V. II, 121; G & F Ex. 29]

6. During the summer of 1988, at least nine head of buffalo were seen on the Warm Springs allotment during July. [V. II, 141–42]

7. In November 1988, Dr. Douglas Woody, a veterinarian employed by the United States Department of Agriculture, Animal and Plant Health Inspection Service (USDA/APHIS) called the Parker ranch and advised them that a brucellosis reactor cow had been traced back to the Parker herd. The cow was a reactor; standard procedures indicated a herd test should be done, and Woody would normally have tested the herd at that time. However, Woody made a decision not to test any animals in the Parker herd, even though he was advised that Parker had no objection to such

testing. [V. I, 53–54, 66–67, 128–129; V. II, 199]

8. The MCI program is a USDA surveillance system which tracks cattle sold for slaughter and tests those cattle for brucellosis. The system has certain limitations and the number of Parker cattle which were actually tested under the program is unknown. [V. II, 192–94, 210; V. III, 213]

9. In February 1989, Dr. Woody again called, this time to report another reactor cow and to advise that a herd test needed to be done. Subsequent testing revealed the herd to be heavily infected with brucellosis. [V. II, 130–31]

10. Brucellosis is an infection by bacteria of the genus Brucella. It is a reproductive disease with its major manifestations being abortions or retained placentas in females and orchitis in males. It is transmitted orally by ingestion of the bacteria from contaminated placentas or other birth products. [V. II, 185–86]

11. Following discovery of the infection, Parker was advised by Dr. Woody that its options were to either depopulate its herd or to begin a series of herd tests and slaughter all reactor animals until no brucellosis could be found in the herd. When asked whether adult vaccination could be used as an alternative means of managing the outbreak, Dr. Woody advised that such an approach would not be considered and could not be used. Adult vaccination was never investigated further. [V. II, 134–35, 161]

12. The Department was not involved in management of the outbreak or related decisions. Those matters were handled by USDA/APHIS and the Wyoming Livestock Board. [V. I, 88–89; V. II, 174]

13. Following discovery of brucellosis in the Parker herd, the herd was disposed of by selling the entire herd for slaughter over a period of time. A number of calves, reactor cows and cull cows were sold immediately. One hundred twenty-five head of yearling heifers were spayed, pastured over the summer of 1989 and sold for slaughter. Most of the herd, 450 cows, heifers and herd bulls and 362 calves were placed on a quarantine feedlot in Idaho. An additional 55 head of cows and their calves were placed on the quarantine lot shortly thereafter. The cows and calves were kept on feed until the fall of 1989 when the calves were weaned. The calves (400 head) were held over, placed on pasture during the summer of 1990 and sold in the fall of 1990. [V. II, 75, 98, 106, 135, 138; Parker Ex. 32, 5–6]

14. Dr. Donald Bridgewater is a veterinarian and is the regional epidemiologist for the USDA's western region, which includes Wyoming. Dr. Bridgewater investigated the Parker outbreak to determine (1) whether the infection was introduced from another state, (2) whether other herds in the area were infected, and (3) who had purchased cattle from the Parker herd. [V. I, 17, 45–46]

15. Dr. Bridgewater concluded, following his investigation, that: "To date, there has been no epidemiological evidence to indicate that brucellosis has been imported into the herd," and that "Elk or bison remain a potential source of brucellosis in the Parker Land and Cattle Company herd." Dr. Bridgewater's testimony is consistent with those conclusions. Neither in his report nor in his testimony did Dr. Bridgewater state a conclusion as to the most likely source of infection of the Parker herd. [V. I, 30, 34; Parker Ex. 32, 2, 29]

16. Dr. Bridgewater was the only expert witness to testify who was personally involved in the investigation of the Parker outbreak. No other witness conducted an independent investigation to determine the source of the outbreak. [V. I, 90, 134; V. II, 38–39, 197]

17. Dr. Norman Swanson has been the Wyoming State Veterinarian for over 20 years. The Livestock Board has regulatory authority over matters of domestic animal health in Wyoming. The Livestock Board, through Dr. Swanson, tracked the handling of the Parker outbreak. Dr. Swanson was not directly involved in the investigation or management of the outbreak. [V. I, 73, 90]

18. Adult vaccination could not have been used in the management of the Parker outbreak without Dr. Swanson's approval. Whether that approach should be approved was never discussed with him. [V. I, 88; Parker Ex. 48]

19. Dr. Mo Salman is a professor at Colorado State University who was retained by Parker as an expert witness in this case. He has not specialized in the study of brucellosis since receiving his Ph.D. [V. I, 104–05] Dr. Salman made no independent investigation of the Parker outbreak and has done no professional work in brucellosis in wildlife. He has no first-hand experience or knowledge of calving, social or migratory behaviors in elk. He is not an expert on elk management or elk diseases. [V. I, 127, 134, 139–40]

20. Dr. Salman stated that contact with neighboring herds of cattle was a possible source of infection and that brucellosis could be transient in a herd of cattle such that it might be present in a herd for a time but go undetected before disappearing from the herd. Dr. Salman also stated that horses could be a source of brucellosis. [V. I, 135, 137] He testified that, in a state where brucellosis is relatively uncommon but which is not brucellosis free, cow/calf operators should reasonably vaccinate at least sixty to seventy percent of replacement heifers. [V. I, 131]

21. Dr. John Reif is a professor at Colorado State University who was also retained by Parker as an expert witness. Dr. Reif is a veterinarian whose background, with the exception of a year in a small animal practice, is primarily academic. Dr. Reif has never done any professional work with brucellosis, diseases in elk or elk behavior. His experience in wildlife diseases is limited to a single study of the prevalence of the disease leptospirosis in antelope and cattle in parts of Colorado. That study did not examine the transmission of the disease between antelope and cattle. Dr. Reif made no independent investigation of the Parker outbreak. [V. II, 3–5, 35, 36]

22. Dr. Reif testified that he did not know the infection status of the Wind River elk herd and did not assume any particular rate of infection for any "subgroup" of elk for purposes of his conclusions as to the likely source of the Parker infection. At the same time, he testified that his opinion was based upon the "extensive" prevalence of brucellosis in feedground elk and that his conclusion that elk were a more likely source of infection than bison assumed "essentially similar" infection rates of 37 and 50 percent for elk and bison respectively. [V. II, 30–33, 40–41, 53]

23. Dr. Reif testified that January 1989 was a critical time for the spread of brucellosis among Parker's cattle because the disease began actively spreading through the herd when calving began in that month. [V. II, 13, 46]

24. Dr. Paul Nicoletti is a veterinarian and university professor and former USDA employee who has specialized in brucellosis work and research since 1960. His testimony was based primarily upon a review of the Bridgewater Report, the Parker damage claim, and a trip to Wyoming to become familiar with the Jackson and Dubois areas. Dr. Nicoletti did not do an independent investigation to determine the source of the Parker outbreak. [V. II, 183–85, 196; G & F Ex. 24]

25. Dr. Nicoletti testified that outbreaks of brucellosis in which wildlife is a potential source present unique problems for investigators. Wildlife sources are more difficult to investigate than bovine sources because their involvement cannot readily be determined in the absence of special expertise in wildlife. [V. II, 208–09] Dr. Nicoletti concluded that there was insufficient information available to reach a conclusion to a reasonable degree of scientific probability as to the source of the infection in the Parker herd. [V. II, 210–11]

26. Dr. Tom Thorne is an employee of the Wyoming Game and Fish Department and is a veterinarian. Dr. Thorne has worked extensively with brucellosis in elk and has over 20 years first-hand experience in wildlife diseases, including brucellosis. He has conducted extensive scientific studies of brucellosis in Wyoming elk and of

the transmission of brucellosis from elk to cattle. [V. III, 66–68, 71–72; G & F Ex. 25] Dr. Thorne testified that elk were not the source of the Parker outbreak and that if wildlife were the source of the disease, bison are more likely than elk to be the source. [V. III, 123–24, 153–54]

27. Kay Bowles is a game warden employed by the Wyoming Game and Fish Department. He has been stationed in Dubois, Wyoming since 1974 and, in the course of his employment, has regularly observed the elk in the Dubois area and their behaviors. No other witness has comparable experience and knowledge concerning the behavior of elk in the Dubois area. [V. III, 4–5, 48–49]

28. The Wind River elk herd or Wiggins Fork elk herd, as it is also known, is a distinct population, separate from the Jackson and Green River elk herds. The Wind River elk herd generally occupies a territory east of the Continental Divide in the area around Dubois, Wyoming. There are no elk feedgrounds in the Wind River herd unit or anywhere else east of the Continental Divide in Wyoming. The Wind River elk winter east of the Divide, calve at lower elevations of the Wind River Mountains east of the Divide, and move to higher elevations during the summer months. [V. III, 5, 7–12, 26, 118; G & F Ex. 26]

29. Jackson and Green River herd unit elk generally winter on elk feedgrounds managed by the Wyoming Game and Fish Department or, in the case of the National Elk Refuge, in cooperation with federal agencies. All of the elk winter feedgrounds are west of the Continental Divide. Elk which belong to feedground herds winter west of the Continental Divide and calve west of the Divide in the spring. Elk do not cross the Divide to calve because calving takes place in May and early June when there is a considerable amount of snow at higher elevations. Traditional calving areas are in sagebrush/aspen habitats at lower elevations. Elk on either side of the Divide calve on the same side of the Divide on which they spend the winter. [V. III, 11, 12, 21, 48, 88–92, 108–112, 118, 140]

Elk from the feedground herds west of the Divide commingle with elk from nonfeedground herds east of the Divide when the two herds move to the top of the Divide during the summer months. Because calving is finished prior to that time, brucellosis transmission does not occur during that time. [V. III, 143]

30. Some elk in herd units where feedgrounds are located do not come to the feedgrounds. Those elk are said to "winter out" but are part of the feedground herds and are distinct and different from nonfeedground elk. Nonfeedground elk are elk which belong to herds in herd units where there are no feedgrounds. The Wind River elk herd is a nonfeedground herd. [V. III, 7, 92–94, 95, 164–65]

31. Brucellosis does not occur in wild elk populations anywhere except in the feedground elk in Northwestern Wyoming. Brucellosis is not transmitted between elk with sufficient frequency to sustain the disease in elk herds except where the elk are concentrated on winter feedgrounds. [V. II, 48, V. III, 143; G & F Ex. 1, 2]

32. Elk-to-cattle transmission of brucellosis has been shown under artificial, experimental conditions. Elk-to-cattle transmission is extremely unlikely to occur under natural conditions, except under extreme circumstances where elk are forced to feed with cattle during winter months when abortions are likely to occur in infected cow elk. [V. III, 79–83; G & F Ex. 18, 19, 20]

33. Elk-to-cattle transmission will only occur in association with an abortion, or birth of a live or dead calf. When they calve, elk seclude themselves from other animals prior to giving birth. Following birth of the calf, the cow immediately consumes the placenta and other birth products and cleans the area where the birth occurs. When an abortion occurs, the cow will consume the aborted fetus unless it is a near-term fetus, which is too large to consume. Kay Bowles reports never having seen an aborted calf or a placenta in the Wind River herd unit. [V. III, 38, 49, 83, 85–87, 114]

34. The only place where elk-to-cattle transmission of brucellosis was likely to occur in this case was on Parker's Crooked Creek property. There is no showing that elk-to-cattle contact occurred during the time when Parker's cattle were on the home ranch and Parker's cattle do not go onto the Forest Service allotments until mid-June when elk calving is substantially completed and the risk of transmission is therefore eliminated. Parker's cattle do share the Crooked Creek property with calving elk during May and early June. [V. II, 120–21; V. III, 86–87, 117] The Wind River elk herd is the herd with which Parker's cattle are in contact at times when brucellosis transmission is likely to occur. Those elk are not infected with brucellosis. The calving rate for the herd is very high, roughly 50 percent as compared to feed-ground elk west of the Divide, which have calving rates of only about 35 percent because of the existence of brucellosis in those herds. Brucellosis does not sustain itself in nonfeedground elk so that the occasional introduction of an infected animal into the Wind River herd cannot spread the disease through the herd generally. [V. I, 58; V. III, 96, 101–02, 118; G & F Ex. 26, 28] Bull elk do not transmit brucellosis. [V. III, 105]

35. Weather conditions during the winter of 1987–1988 and the spring and summer of 1988 did not increase the likelihood of transmission of brucellosis from elk to Parker's cattle during those times. [V. III, 16–17, 29] Because nonfeedground elk east of the Divide are not infected with brucellosis and because almost no feedground elk move east of the Divide and calve there, there are very few infected elk which could come into contact with Parker's cattle. Elk generally avoid cattle. The calving habits of elk are such that the likelihood of elk-to-cattle transmission is further reduced. The elk's habit of secluding themselves during the birth process and of consuming the placenta and other birth products and cleaning the area where the birth takes place eliminates the opportunity for contact with infectious materials and hence, the transmission of brucellosis. [V. III, 13–16, 96, 116–17, 123; G & F Ex. 26]

36. Bison were seen in close association with Parker's cattle during the summer of 1988. Bison have a strong herding instinct and will graze with cattle on summer range. Bison calve throughout the summer and do not seclude themselves during the birth process like elk. [V. II, 141–43, 116; V. III, 84, 86, Parker Ex. 32] The wild bison seen with the Parker cattle and on Parker's Warm Springs allotment were from either the Jackson (Teton) herd or one of the Yellowstone herds, all of which are known to be infected with brucellosis. [Parker Ex. 32, p. 20–21] Bison are a more likely source of the brucellosis outbreak in the Parker herd than are elk. [V. III, 86, 123]

37. Public hunting of bison under the management of the Wyoming Game and Fish Department did not occur prior to the winter of 1989–1990. Bison are not now classified by the Department as a game animal [V. III, 21–22], nor were they at the time the disease was transmitted to the Parker herd.

38. The fact that the strain of brucellosis that is commonly found in wildlife (Biovar 1) was the same strain that caused the Parker herd infection provides no evidence of the source of the infection. This is so because Biovar 1 is also the strain most commonly found in cattle and would likely be found regardless whether the source was cattle or wildlife. [V. I, 139; V. II, 206–07]

39. Dr. Thorne is the only witness with demonstrated expertise in brucellosis in wildlife. He has studied brucellosis in elk extensively and has first-hand experience with the disease in wild bison. He is also familiar with the behaviors of elk and bison in Northwest Wyoming. Kay Bowles is the best authority on behaviors of elk in the wild. The testimony of Thorne and Bowles with respect to elk behavior is uncontroverted.

40. Cattle cannot be entirely eliminated as a potential source of the Parker outbreak. Cattle purchased by Parker in 1984 could have infected the herd. Contact with

infected cattle from neighboring herds could have occurred. Parker cattle contact cattle from as far away as Jackson. Cattle brought to the Dubois area for summer pasture could have carried the disease. [V. II, 164–65, 198, 210–11] Some bulls which had to be brought into the Parker herd prior to 1988 were no longer in the herd and were not tested when the outbreak was investigated. Neighboring herds were not looked at closely after they tested negative. [V. I, 47, 60]

41. Dr. Salman testified that horses were a potential source of the disease. There is no evidence that horses as a source were ever investigated. [V. I, 135]

42. Elk are an extremely remote possibility as a source of the disease. The behavior of elk at calving is such that transmission from elk to cattle in the wild is extremely unlikely to occur. Elk generally avoid close association with cattle. The Wind River elk herd is not infected with brucellosis. In combination, these factors make elk the least likely source of the Parker outbreak. [V. III, 122–23]

43. Bison are more likely than elk to be the source of the Parker outbreak. Bison in the area are heavily infected with brucellosis. Bison calve throughout the spring and summer and could, therefore, transmit the disease at any time. Bison will herd with cattle and were seen in association with the Parker cattle during the summer of 1988, when Parker claims his herd was initially infected. [V. III, 123–24, 153–54]

44. The evidence of this proceeding does not establish to a reasonable degree of medical or scientific probability the source of the Parker outbreak. The experts who were best qualified and most credible with respect to brucellosis in both livestock and wildlife were Dr. Bridgewater, Dr. Nicoletti and Dr. Thorne. None of them testified that wildlife was the most probable source of the disease. Dr. Bridgewater was apparently unable to reach that conclusion. Dr. Nicoletti testified that he was unable to determine the source of the disease to a reasonable degree of certainty. Dr. Thorne was of the view that elk were not the source of the disease and that bison were a more likely source than elk.

45. Dr. Salman, who testified that he believed there was a greater than 50 percent probability that wildlife was the source of the disease, had no experience with the disease in wildlife and had no experience with elk or bison behaviors and movements in Northwestern Wyoming. Dr. Reif, who testified that wildlife was the likely source of the disease, has no experience whatever with the disease, the disease in wildlife or the behaviors and movements of elk or bison in Northwestern Wyoming. Dr. Reif's testimony is simply not persuasive. Dr. Reif's conclusion that elk are a more likely source of the infection than bison is based upon the incorrect assumption that the Wind River elk herd is infected with brucellosis to the same degree as feedground elk west of the Divide.

46. The evidence shows that of the four potential sources of the outbreak, elk are the least likely, bison and cattle can only be said to be potential sources, and horses cannot be evaluated as a source. Parker has not shown to a reasonable degree of probability which potential source is in fact the source of the Parker outbreak. The evidence reveals that the conclusion that wildlife were the most likely source of the disease is driven exclusively by the failure of the Bridgewater investigation to identify a bovine source. Parker's witnesses simply are not knowledgeable concerning brucellosis in wildlife or the behaviors of wildlife and the nature of the infections of wildlife in Northwestern Wyoming. They were, therefore, able to analyze only one side of the question and their conclusions are unreliable for that reason.

47. Parker's vaccination program was below the usual standard for comparable herds in the area. Herds in the area, other than Parker's, having 600 or more test-eligible cattle had an average (unweighted) of 51.8 percent ear tagged as official calfhood vaccinates. The Parker Ranch had only 25.89 percent tagged as official calfhood vaccinates. [Parker Ex. 32, 13–15] Additionally, Parker had no vaccination

program at all before 1984, when Wyoming was not brucellosis free and vaccination of 60 to 70 percent of its heifers should have been maintained as a reasonable level of vaccination. [V. I, 74–75, 131] Although vaccination does not provide 100 percent protection against brucellosis, a thorough vaccination program has the important effect of preventing the rapid spread of the disease within a herd should infection occur. Therefore, an outbreak in a vaccinated herd can be controlled without the necessity for depopulating the herd since fewer animals become infected and the infection will spread slowly. [V. I, 56, 132–33; V. II, 202–03]

48. A high percentage of the cattle found to be infected in the Parker herd were older cattle that had not been vaccinated. [V. I, 55–56; Parker Ex. 32] Parker's failure to maintain a thorough vaccination program contributed materially to the severity of the outbreak in the Parker herd. A cow which tested positive for brucellosis was traced to Parker's herd in November, 1988, but no herd test was done until a second animal was traced to the herd in February 1989. Between November 1988 and February 1989, the disease was actively spreading through the herd. [V. II, 13, 46, 200] Failure to test the herd in November 1988 contributed materially to the severity of the outbreak in the Parker herd.

49. When only a few animals are infected in a herd, the infection can be controlled without destroying the herd. Therefore, had either Parker vaccinated more of its cattle or had the herd been tested and control measures implemented in November 1988, the necessity for destroying the Parker herd would have been avoided and Parker's losses would have been very small. [V. I, 89, 132–33; V. III, 191, 200]

50. Use of adult vaccination as an alternative in controlling the Parker outbreak was rejected without being investigated by regulatory officials, in part, at least, because depopulation is "policy" and any other alternative would be a headache for regulators. Adult vaccination should have been investigated as a possible means of minimizing Parker's losses. Use of adult vaccination could have allowed Parker to control the infection of its herd without destroying the entire herd. [V. I, 112–14; V. II, 201, 229–30; V. III, 214]

51. The Wyoming Game and Fish Department was not consulted at any time for purposes of allowing the Department input into the management of the Parker brucellosis problem. The Game and Fish Department has no regulatory authority (unlike the State Veterinarian and Livestock Board (see W.S. 11–18–103)) to require vaccination of cattle for brucellosis. The Wyoming Game and Fish Department, therefore, had no opportunity to avoid or reduce the damages it is now being asked to pay. [V. I, 88; V. II, 174]

52. To the extent that the Wyoming Game and Fish Department could reduce the risk of transmission of brucellosis to domestic animals from wildlife by managing the disease in wildlife, the Department has done all that could reasonably be expected. The Department has funded and conducted research to identify the nature and extent of brucellosis infections in wildlife by vaccination and has funded such a vaccination program. The Department has also conducted original research to develop methods of controlling brucellosis in wildlife. The Department has worked with the Wyoming Livestock Board and State Veterinarian (which have made no financial contribution toward managing the disease in wildlife), federal agencies that manage wildlife on Teton and Yellowstone National Parks, and USDA/APHIS. In addition, the Department has worked with private industry in its brucellosis program. The results of Department research have been published in popular publications and scientific journals over the years. There is no evidence whatever that the Department has ever sought to withhold information on brucellosis in wildlife or has ever failed to exercise reasonable diligence in identifying and dealing with the presence of brucellosis in wildlife. [V. I, 91, 93, 203–04; V. III, 71–80; 184–85; G & F Ex. 4–7, 13–21, 25]

53. Except for the Parker outbreak, there has not been a documented case of brucellosis in cattle east of the Continental Divide in Northwestern Wyoming during the past 20 years. [Parker Ex. 23] Parker operated for roughly 20 years prior to 1984 or 1985 without vaccinating its cattle against brucellosis. [V. II, 109, 118] Cow/calf operations are common in the Dubois area and no operator has chosen to eliminate its cow/calf operation because of the risk of brucellosis in wildlife in the area. Vaccination provides efficient protection against loss of an entire herd in the event of a new infection. [V. I, 89, 110, 132–33; V. III, 204–05] Parker's decision that it cannot continue as a cow/calf operation because of the risk of a future outbreak of brucellosis is unreasonable.

54. The Parker claim should be denied.

## CONCLUSIONS OF LAW

1. In interpreting a statute, we must first determine the statute's intent and purpose and then give effect to that intention. The course of that intent must, wherever possible, be found in the language of the statute itself and not conjecture. *Geraud v. Schrader*, 531 P.2d 872, *cert. denied Wind River Indian Ed. Ass'n, Inc. v. Ward*, 423 U.S. 904, 96 S.Ct. 205, 46 L.Ed.2d 134 (1975). It would be conjecture to add disease transmitted by wildlife as a basis for a claim under W.S. 23–1–901. Neither the courts nor the commission can enlarge, stretch, expand, or extend a statute to matters not falling within its express provisions. *Lo Sasso v. Braun*, 386 P.2d 630 (Wyo.1963).

2. Where a statute enumerates the subjects or things on which it is to operate, or the persons affected, it is to be construed as excluding from its effect all those subjects and things not expressly mentioned. *Town of Pine Bluffs v. State Board of Equalization*, 79 Wyo. 262, 333 P.2d 700 (1958). There is no express mention in the statute of damage caused by brucellosis or

any disease so therefore it is not compensable.

3. There can be no waiver of immunity by an agency of the State unless by specific legislative authority. *Maffei v. Incorporated Town of Kemmerer*, 80 Wyo. 333[33], 338 P.2d 808 (1959)[1]; *Price v. State Highway Commission*, 62 Wyo. 385, 167 P.2d 309 (1946).

4. Crops are the products of the soil and do not include cattle or livestock. *Black's Law Dictionary*, 6th Ed.; *Ellis, McKinnon & Brown v. Hopps*, 30 Ga.App. 453, 118 S.E. 583 (1923); *O'Neill Production Credit Ass'n v. Schnoor*, 208 Neb. 105, 302 N.W.2d 376 (1981).

5. W.S. 23–1–901 is plainly intended to create a mechanism by which landowners can be compensated for damage and injuries done by wildlife. The questions raised here concern the kinds of injuries that are compensable, the kinds of damages that may be claimed for an otherwise compensable injury, the kinds of animals' damage that is compensable, and how the limitations on time for filing claims contained in W.S. 23–1–901 should be interpreted and applied. As to the first issue, outbreaks of disease are not an injury which may be compensated under W.S. 23–1–901. Nowhere in the statutes relating to wildlife is disease even mentioned in any concept.

6. W.S. 23–1–901 is not intended to be a waiver of the state's immunity for claims arising out of every kind of damage or injury caused by wildlife. It is, rather, intended to compensate a particular class of persons, landowners, for injury to certain kinds of property interests. The list of property interests which the Commission shall consider in awarding damages, which is found in W.S. 23–1–901(c) is indicative of the intent of the legislature with respect to the kinds of injuries which may be compensated. The injuries enumerated in W.S. 23–1–901(c) are of a kind commonly associated with interference of big or trophy game animals or game birds with agricultural operations, other than livestock, ex-

---

1. *Maffei* has been partially overruled by *Collins v. Memorial Hospital of Sheridan County*, 521 P.2d 1339 (Wyo.1974), but only insofar as it holds that the purchase of liability insurance is not a waiver of tort immunity, a question not involved in the proceeding.

cept with respect to injury caused by trophy game animals or being gored by elk, a big game animal as defined by W.S. 23–1–101(a)(i). The legislature plainly had injuries of that general kind in mind when W.S. 23–1–901 and its predecessors were enacted. It is widely and commonly known, for instance, that big game animals trample and consume stored and growing hay and other crops. Fences and other improvements are sometimes damaged by big game animals. Trophy game animals such as mountain lions sometimes destroy livestock, and game birds feeding in large flocks sometimes do significant damage to crops. These types of damages and injuries are manageable by the Game and Fish Commission, whereas the control of disease after transmission is not.

7. Since W.S. 23–1–901 is a statute in derogation of sovereign immunity, it must be strictly construed in favor of the State. The State's right to immunity from claims against it may not be diminished except where the express terms of a statute disclose a clear intent by the legislature to waive that immunity. Where there is any doubt as to the meaning or intent of a statute, it must be given the effect which makes the least, rather than the most, change in sovereign immunity. *White v. Burns*, 213 Conn. 307, 567 A.2d 1195, 1198 (1990); 2A Sutherland Statutory Construction, § 58.04; 82 C.J.S. *Statutes*, § 391.

8. Injury caused by outbreaks of disease are unique and different from the kinds of injury enumerated in W.S. 23–1–901. Diseases have long been a problem for livestock producers and the legislature has long taken an active role in regulation to control outbreaks of disease in livestock. Additionally, the legislature has provided, in the context of regulation of the livestock industry, a means for compensating livestock producers who suffer losses in connection with the application of regulations intended to control diseases in livestock. W.S. 11–19–101 et seq. The source of disease is not mentioned in such section.

9. It is apparent that cases such as this, in which an outbreak of disease occurs in livestock and in which officials of government agencies responsible for regulating with respect to livestock diseases act to eliminate the disease by means which have the effect of destroying the infected herd, claims against the state should properly be made under statutes governing regulation of livestock diseases and the livestock industry. This claim is not properly within W.S. 23–1–901, which concerns the management of wildlife.

10. It may be argued that the claimant should have the option to choose his remedy since the state has, in either event, evidenced a willingness to allow a claim to be brought. This argument lacks merit here because the legislature has, in addition to providing separate provisions for bringing the claims, provided separately for funding payments to claimants. Funds for payment of claims brought under W.S. 23–1–901 are payable out of certain hunting license fees earmarked for that purpose. W.S. 23–2–101(c). Funds for payment of claims brought under W.S. 11–19–106 must be specially appropriated for that purpose. W.S. 11–19–109.

11. Enactment of separate statutes providing for claims which are specially funded evidences the legislature's intent that claims be brought only under the applicable statute. In this case, the applicable statute is W.S. 11–19–106 and not W.S. 23–1–901.

12. Compensation under W.S. 23–1–901 is limited to damages done by big and trophy game animals and game birds. It is apparent, for instance, that the legislature does not intend that W.S. 23–1–901 should apply to allow compensation for losses to livestock caused by predatory animals like coyotes and others enumerated in W.S. 23–1–101(a)(viii). Compensating landowners for injuries done by those animals would be extraordinarily difficult and expensive.

13. Bison are not big or trophy game animals. The terms "big game" and "trophy game" are specifically defined in W.S. 23–1–101 and do not include bison. The definitions in W.S. 23–1–101 have express application to Title 23, and thus to W.S. 23–1–901 under which this claim is brought. Damages caused by bison are, therefore,

not compensable under W.S. 23–1–901. While bison are big as far as size is concerned, they are not so listed as within W.S. 23–1–101.

14. The Commission is directed to consider claims filed under W.S. 23–1–901 "based upon a description of the livestock damaged or killed by a trophy game animal, the damaged land, growing cultivated crops, stored crops, seed crops, improvements and extraordinary damage to grass." This is a limitation on damages which may be paid both as to the property damaged and the kind of damage. Thus, damage to livestock may be paid only if caused by trophy game animals and damage may be paid only for the actual value of the property damaged. W.S. 23–1–101 defines a trophy game animal as meaning "black bear, grizzly bear or mountain lion." Parker's claim is for damage to livestock not caused by trophy game animals, and is, therefore, not compensable.

15. Unless an agency in a contested case makes findings of basic facts upon all of the material issues in this proceeding and upon which its ultimate findings of fact or conclusions are based, there is no rational basis for judicial review. The failure of an agency to make findings of basic facts upon all material issues in a proceeding such as this and upon which its ultimate findings of fact or conclusions are based makes its determination susceptible to the charge that its order entered is contrary to law. *Pan American Petroleum Corporation v. Wyoming Oil and Gas Conservation Commission*, 446 P.2d 550 (Wyo.1968).

16. The Wyoming Supreme Court has recognized that the concept of the burden of proof has its place in administrative proceedings. *Id.*

17. The Wyoming Rules of Evidence provide that "[i]n all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence." W.R.E. 301.

This is the traditional measure of persuasion in civil cases and is called proof by a preponderance of evidence. McCormick on Evidence, 3d Ed. § 338 at 957. As stated in the Wyoming Rules of Evidence, proof by a preponderance is proof that leads to a finding "that the nonexistence of the presumed fact is more probable than its existence." *Id.* This definition of preponderance of the evidence has been adopted in Wyoming. *Scherling v. Kilgore*, 599 P.2d 1352 (Wyo.1979). It was reapplied in *Reed v. Getter Trucking, Inc.*, 735 P.2d 1370 (Wyo.1987). The conclusion of what preponderates is with the trier of fact. *Curless v. Curless*, 708 P.2d 426 (Wyo.1985). Accordingly, Parker has the burden of proving that the damage was caused by big or trophy game animals or game birds. The existence of this proposition must be more probable than its nonexistence; it is not shown by the evidence produced in this case.

18. Two types of evidence are recognized by which a trier of fact may properly find the truth: direct evidence or indirect or circumstantial evidence. *Blakely v. State*, 542 P.2d 857 (Wyo.1975), *see also* Wyoming Civil Pattern Jury Instruction 2.01. In contrast to direct evidence where there may be, for example, testimony of an eyewitness, there is also indirect or circumstantial evidence. Indirect or circumstantial evidence is commonly defined as the proof of a chain of circumstances pointing to the existence or nonexistence of certain facts. Generally, Wyoming law does not recognize any distinction between direct and circumstantial evidence. As stated in *Blakely*, 542 P.2d at 862, circumstantial evidence should be measured upon the same basis as direct evidence. Through circumstantial evidence, a high degree of certainty can be achieved.

19. The claimant failed to show by a preponderance of the evidence, both direct and circumstantial, that brucellosis in its herd was transmitted by wildlife. The totality of evidence does not prove what the source was and remains unknown.

20. The Parker claim should be denied.

DATED this ___ day of _____, 1991.

For the Commission

President
Wyoming Game and Fish Commission

## BEFORE THE WYOMING GAME AND FISH COMMISSION

In the Matter of: Parker Land and Cattle Company Damage Claim

Claim No. FY90–119

### ORDER DENYING CLAIM

The Wyoming Game and Fish Commission having made and filed its Findings of Fact and Conclusions of Law, it is

ORDERED that the claim of Parker Land and Cattle Company be, and is, denied.

Dated this ___ day of _____, 1991.

For the Commission

President
Wyoming Game and Fish Commission

THOMAS, Justice, concurring in part and dissenting in part.

I concur in that aspect of the opinion in which the court concludes to affirm the order of the Commission because substantial evidence supports the ruling that Parker Land & Cattle Co. failed to establish the source of the brucellosis. I dissent from the first aspect of the opinion of the court that the claim is not cognizable under the statute so far as the potential source of infection may be elk. In this regard, I join in the dissenting opinion of Justice Urbigkit and the concurring opinion of Justice Cardine. I would permit cognizance of a claim for infection by bison as a taking by the State, but would not perceive it necessary to address the issue in light of the ruling as to the failure of proof on the part of the claimant.

CARDINE, Justice, specially concurring.

I proceed from the premise that the Game and Fish Commission is liable for all damages (whether from disease, killing, clawing, injury or otherwise) to the livestock and property of citizens caused by big game, trophy game or other animals claimed, owned, protected by or licensed for hunting and taking by the Game and Fish. I would construe the pertinent statutes in pari materia to so provide.

Thus, if an owner can establish that elk, bison, or other big game or trophy game animals under the protection and authority of the Game and Fish Commission have transmitted disease which damaged (in this case it is alleged to have resulted in destruction of) a rancher's cow herd, I cannot buy into a construction of our game and fish legislation that results in the Game and Fish ducking responsibility for damage it caused and the rancher going bankrupt. I do not believe the Game and Fish Commission is contending for that result. I am convinced that if there were clear proof that this rancher's livestock herd was destroyed because of contamination by game animals, the Game and Fish would have been prepared to accept its responsibility and compensate the rancher accordingly.

With respect to legislative intent, that ought to be determined by conditions as they exist today in our society. Game and fish is big business. It generates large revenues from its game and fish operation. Much of the wild game feed off deeded lands owned by ranchers. The game goes to water in reservoirs and ponds constructed by ranchers and in creeks which often lie on ranchers' deeded land. The Game and Fish Commission acknowledges its working partnership with the ranching community and generally accepts its responsibility when its operation causes damage to this segment of our community.

I cannot agree to the statutory construction developed by the majority. Due to the inconsistent placement of defined terms such as "trophy game animals" and "big game animals" within the subsections of W.S. 23–1–901, I would conclude that the statute is ambiguous concerning any intent to limit a claim based on the types of damages or the type of game animal. Then, because both wild bison and elk are directly controlled by the Game and Fish, I would hold that this general game damage

statute was intended to apply when wild bison and elk damage private livestock. Therefore, in a claim in which the proof is clear, the facts favorable to the damaged rancher, and which establishes the cause of a rancher's damage as contamination by game animals, I would allow recovery.

Were I deciding this case in the first instance, I might be inclined toward appellant. However, on appeal the question presented is one of substantial evidence to support the findings of the hearing officer and the decision of the commission. The Game and Fish Commission's decision was based upon the conflicting testimony of the several expert witnesses. As stated by the court in its opinion, there was substantial evidence from the testimony of the experts most familiar with brucellosis and most familiar with wildlife brucellosis and this particular outbreak to support the finding that the source of the brucellosis had not been established by appellant by a preponderance of the evidence. In fact, the expert who investigated this outbreak could only conclude that the elk and bison were a potential, not a probable, source of the brucellosis. Therefore, I can agree that the Game and Fish Commission did not abuse its discretion in denying appellant's claim and will, with some reservation, concur.

URBIGKIT, Justice, Retired, dissenting.

With exhaustive scholarly detail, this court traces the history of Wyoming game management. Intertwined with that history, this court also comprehensively reviews excerpts from developed principles of statutory construction. *See, e.g., Allied–Signal, Inc. v. Wyoming State Bd. of Equalization*, 813 P.2d 214 (Wyo.1991), Urbigkit, J., specially concurring. This court then continues to resolve whether state owned and managed wildlife which inflicts injury on property interests of a private individual

is to be defined as an injury without remedy (*injuria absque damno*) through statutory interpretation. *Cf. Parker Land and Cattle Co., Inc. v. United States*, 796 F.Supp. 477 (D.Wyo.1992). With appreciation of the detailed Wyoming history and recognition that statutory interpretation still remains an inexact science, I respectfully dissent.

I conclude conversely to the majority. If the livestock operator, with adequate proof, can demonstrate how the disease-spreading state wildlife inflicts that scourge on the property of a private individual, I believe a remedy for damage should not be denied to the party injured. There is nothing found in Wyoming legal history or governmentally-applied responsibilities that should justify a countervailing decision based on plain meaning of a statute or otherwise. The Wyoming Game and Fish Commission should be financially responsible for the results of their management of wildlife which, by negligence or inattention, spreads contagious livestock diseases. That intendment to meet the constitutional responsibilities of Wyo. Const. art. 1, § 33 [1] can be found within the laws which are the subject of this review and consequent decision.

An opinion writer does not need exhaustive research to understand that representatives of the livestock industry were substantially numbered in the past annual and biennial sessions of the Wyoming legislature. We could then judicially notice their intelligence and the comprehensive attention which has been given to the responsibilities of the legislature to support and assist this important state industry.[2] It is hard to believe that a Typhoid Annie danger, such as the spread of brucellosis to the cattle of private ranchers, was to be an acceptable or required risk of coexistence between the livestock operator and the

---

1. Wyo. Const. art. 1, § 33 states that "[p]rivate property shall not be taken or damaged for public or private use without just compensation."

2. The amicus brief filed in behalf of the Mountain States Legal Foundation and the Wyoming

Stock Grower's Association appropriately recognizes that the Stock Grower's Association represents 1,500 ranchers, which are a vitally important economic interest for the economy of Wyoming.

state agency responsible for wildlife management.

Additionally, I apply another tenant of statutory interpretation, presumed constitutionality, *Paravecchio v. Memorial Hosp. of Laramie County*, 742 P.2d 1276 (Wyo.1987), *cert. denied* 485 U.S. 915, 108 S.Ct. 1088, 99 L.Ed.2d 249 (1988), for a result that would not justify the taking of private property for public benefit contrary to Wyo. Const. art. 1, § 33. A safe haven permitting the state agency to maintain its assets in a fashion which spreads disease from public property onto private lands and into the livestock operator's cattle herds could properly be considered to be that level of confiscation of property for "public benefit." *State Highway Commission v. Peters*, 416 P.2d 390 (Wyo.1966).

Consequently, I would find no impedance in the Game and Fish damage statute, Wyo.Stat. § 23–1–901 (1991), precluding damage recovery resulting when game animals spread contagious diseases. Within a result-defined comparison, there is little difference between the predatory characteristics of some kinds of wildlife who kill the animals of a rancher for food or otherwise or the bacilli, bacteria or virus which are nurtured by the wildlife and spread into the cattle herds with an equally damaging conclusion.

It is appropriate to note, as the United States Supreme Court recently reiterated, with statutory construction that "the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished." *Estate of Cowart v. Nicklos Drilling Co.*, —— U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379, *cert. denied* —— U.S. ——, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992). *See also Demarest v. Manspeaker*, 498 U.S. 184, ——, 111 S.Ct. 599, 603, 112 L.Ed.2d 608 (1991). The second stage in statutory interpretation seeking legislative intent, *Allied–Signal, Inc.*, 813 P.2d 214, is to find a consistent and realistic intendment which includes the presumed desire of the legislature to recognize its legislative duty to "protect, obey and defend," in providing for constitutionally guaranteed interests. That guarantee should include the ownership of private property and a correlative right to compensation when damaged by governmental agency invasion. Wyo. Const. art. 1, § 33; *State Highway Commission v. Rollins*, 471 P.2d 324, 328 (Wyo. 1970).

The specific statutes which require our analysis, in addition to Wyo.Stat. § 23–1–901, are, currently, Wyo.Stat. § 23–1–101(a)(xiii) (1991), § 23–1–302(a) (1991), and § 23–2–107 (Supp.1992).[3]

3. "Wildlife" means all wild mammals, birds, fish, amphibians, reptiles, crustaceans and mollusks, and wild bison designated by the Wyoming game and fish commission and the Wyoming livestock board within Wyoming. Wyo.Stat. § 23–1–101(a)(xiii).

(a) The commission is directed and empowered:

(i) To fix season and bag limits, open, shorten or close seasons on any species or sex of wildlife for any type of legal weapon, except predatory animals, predacious birds, protected animals, and protected birds, in any specified locality of Wyoming, and to give notice thereof;

(ii) To establish zones and areas in which trophy game animals may be taken as game animals with a license or in the same manner as predatory animals without a license, giving proper regard to the livestock and game industries in those particular areas[.]

Wyo.Stat. § 23–1–302(a)(i) and (ii).

(a) Any person who will be fourteen (14) years of age or older prior to September 15 of the season for which the wild bison license is issued and who qualifies under W.S. 23–2–106 may apply to the department for a wild bison license.

(b) A resident applicant shall pay a license fee of two hundred twenty dollars ($220.00). A nonresident applicant shall pay a license fee of one thousand three hundred fifty dollars ($1,350.00) and shall pay the fee required by W.S. 23–2–101(e).

(c) The commission shall promulgate reasonable rules and regulations regulating wild bison licenses and the management of wild bison.

Wyo.Stat. § 23–2–107.

A bison (buffalo) is a mammal. A wild bison is a wild mammal and also a state-owned wild animal. Generic recognition of the state ownership was first found in 1973 Wyo.Sess.Laws ch. 249, where wildlife was defined as all wild animals. The more specific terminology was added in 1979 Wyo.Sess.Laws ch. 140, where wildlife was defined, inter alia, as "all wild mammals." The wild bison hunting statute, which

The majority opinion achieves its conclusion to leave the wild bison out of the state regulatory and ownership system, including responsibility for damage, by two exclusionary determinations. First, it is announced that the wild bison, different from elk, moose or other wildlife, is neither a big nor a trophy game animal under the statutory construction of the damage statute, Wyo.Stat. § 23–1–901. It is then concluded that the terminology in that statute, "damaged by," cannot be extended to the transmission of contagious infectious conditions from the state herds to private livestock.

It is my persuasion that the historical analysis used, although clearly accurate in text, cramps the plain meaning of the English language and ignores the conclusive right of the damaged private individual for compensation for harm caused within Wyo. Const. art. 1, § 33.

This cramped and illogical construction is achieved by ignoring the fact that the wild bison are wildlife and, as such, are a state source of private property damage. I do not accept any thesis which in original concept concludes that sovereign immunity limits state taking liability under the express constitutional provision. To differentiate the wild bison from the elk and moose develops a convoluted and partially inoperative result for the statutes and precludes their constitutional application equally to identifiably similar state wildlife. *See State Bd. of Equalization v. Cheyenne Newspapers, Inc.*, 611 P.2d 805, 809 (Wyo. 1980).

The legalistic fallacy in the majority's "plain meaning" construction is confinement of right to damage recovery by applying the generically different hunting license statutes as the criteria for definition of words which have both a description in the licensing statutes and an obvious meaning in general text as a character of property owned by the state. I fail to read into the statute exclusions from damage responsibility based on availability for the issuance of licenses to hunt, which would mean, under the circumstances of this case, that pre–1989 bison damage was not compensable, but once you could hunt buffalo, if a license was obtained, then compensation for damage caused by the state-owned wildlife then also became available. The thesis is not determinable to me that in 1987 and 1988, wild bison as state-owned wildlife did not come within the damage statute until the 1989 enactment changed their wildlife character into a trophy game animal characteristic for licensing purposes. Consequently, I would find damage-caused coverage for wild bison to exist under Wyo.Stat. § 23–1–901 equally with the huntable elk and moose, which come similarly within the mammal family of state-owned wildlife.

There is another misconception in damage liability analysis in the majority decision. Unlike eating the pasture or destroying the haystacks, these wildlife do not cause damage to a tangible real property interest of the livestock operator. It is the contagious condition with which they are infected and which is consequently spread to alleged disease-free livestock that occasions the source and substance of this litigation. There is general recognition that the entity that maintains diseased livestock is liable for the spread of a contagious condition to the livestock of others creating a civil cause of action from which recovery can follow. *Grayson v. Lynch*, 163 U.S. 468, 16 S.Ct. 1064, 41 L.Ed. 230 (1896). A similarity exists with developing litigation today where the person infected with AIDS infects another without providing caution or warning. In the case of the wild bison, obviously in the empirical sense, they are blameless; it is the owners and the system of game management from which injury

---

provided for licensing to hunt this state animal by conversion into an available game animal for hunting, came with 1989 Wyo.Sess.Laws ch. 23, which added these buffalo (wild bison) as a licensed object for the Wyoming hunting experience. With creation of the wild bison hunting license, contribution from each issued license provides revenue for the game damage fund.

This new hunting prospect does not come cheaply with a resident's license fee of $220 and a nonresident's license fee of $1,350. Obtainable within a lottery licensing process, only the mountain goat licensing fee of $1,500, effective January 1, 1991, is more expensive, with grizzly bears and mountain sheep (if any licenses are issued) equal in license fee cost.

and compensable damage may arguably flow as a civil cause of action. *Hall v. Miller*, 143 Vt. 135, 465 A.2d 222 (1983). It is simply to state an apparent fact that private property is taken by the "public" when diseased wild game animals damage and destroy personal property (livestock).

Consequently, within the context of Wyo. Stat. § 23-1-901 and Wyo. Const. art. 1, § 33, the taking by contagious disease epidemic is an issue different from either the crop damage inquiry or the trophy animal killing of privately owned livestock. It is, however, damage caused by state wildlife for which compensation should properly be paid.

It is my view that the legislature had already directed this result in existing enactments. However, with the majority decision, the future can only provide answers for this significant societal problem by new legislation. Consequently, I challenge the legislature to correct the injustice which this decision creates. Appellant may not be benefitted, but certainly the ingenuity and the challenge to governmental responsibility can now be thoughtfully addressed by future legislative sessions.

I would have provided a remedy for the injury with an appropriate construction of existing state statutory provisions. Lacking that capacity, I commend careful attention of the membership of the legislature and the involved industries of this state to work together to provide the answer through future legislation.

I dissent in the belief that the right to recover for the damage is included in present laws, but further recognize my hope for future attention by the Wyoming legislature under these circumstances.

The foregoing, in the context of a general dissent, only makes sense if it is recognized that the section in the majority opinion on sufficiency of the evidence was added after this dissent had been written. A decision on the further subject was required in order to maintain some agreement of a majority of the court. Following the supplementation of the majority opinion, the concurring and dissenting opinion of Justice Thomas and the specially concurring opinion of Justice Cardine were composed.

At this juncture, where the present majority makes a sufficiency of the evidence determination in decision to justify affirming the initial decision, I write to recognize my dissent *on that subject* also. It is my persuasion that the Wyoming Game and Fish Commission really decided the case on a statutory interpretation and then threw in sufficiency of the evidence for good measure. Carefully, comprehensively and completely reading the record lead me, initially and now at this time, to conclude that the Commission was not only incorrect on statutory interpretation, but also incorrect regarding the hearing evidence which provides adversely, in my opinion, a clear persuasion for game animal infection of the rancher's livestock. In reality, the agency was just protecting itself from damage payment obligation.

Consequently, I dissent at this stage in the final decision, which is adverse to the livestock operator, rather than concurring specially to reverse by application of statutory interpretation principles.